REDACTED VERSION

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | |
|---|---|
| L-3 COMMUNICTIONS EOTECH, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATE OF AMERICA,<br><br>Defendant. | Civil Action No. 08-515<br><br>**FILED UNDER SEAL**<br>**REQUEST FOR PROTECTIVE ORDER PENDING** |

**COMPLAINT FOR PRELIMINARY AND**
**PERMANENT INJUNCTIVE AND DECLARATORY RELIEF**

For its Complaint against the Defendant United States, acting through the Department of the Army's Joint Munitions & Lethality Life Cycle Management Acquisition Center ("Army"), Plaintiff L-3 Communications EOTech, Inc. ("L-3") states as follows:

**NATURE OF THE ACTION**

1. This is a preaward bid protest of L-3's exclusion from the competitive range under Solicitation No. W15QKN-07-R-0428 (the "RFP" or "Solicitation"). The Solicitation seeks proposals to supply optical gun sights. The Army is authorized to award one or two contracts as a result of the Solicitation, with a minimum ordering quantity of 100,000 units for one contractor or 50,000 per award for two contractors.

2. L-3 submitted a proposal in response to the Solicitation, including 20 samples of its sight. Through testing these samples, the Army evaluated L-3's sight on two weapons, the M16A2 rifle and the M4 carbine. The L-3 sight readily passed the Endurance Live Fire test on the M4, far exceeding the RFP's requirements. But this identical sight failed the identical test on the M16A2.

3. This occurred because the Army failed to properly secure the mount for L-3's sight on the M16A2's carry handle. Instead, the Army relied solely on "hand-tightening," a method not specified in the RFP and incapable of uniform application across all samples and all offerors, particularly in light of the fact that each offeror proposed different designs.

4. Furthermore, the Army's improper mounting of the sight could have been easily resolved if the Army simply had sought a minor clarification in accordance with the Federal Acquisition Regulation ("FAR") 15.306(b)(2), which it failed to do. Consequently, the Army arbitrarily, capriciously, and irrationally eliminated L-3 from the competitive range by applying an unstated evaluation methodology, conducting the test improperly, and failing to seek a simple clarification from L-3.

5. Eliminating L-3 has effectively resulted in a sole source procurement by reducing the competitive range to one company – Aimpoint Inc. ("Aimpoint") [redacted]

6. The administrative record of this procurement will also reveal that the Army engaged in disparate treatment of Aimpoint and L-3. Specifically, the Army has determined to award the contract to Aimpoin[redacted]was the basis of L-3's exclusion from the competitive range. Indeed, the Aimpoint design[redacted] Thus, under the RFP, Aimpoint's sigh[redacted]The Army, nonetheless, intends to award the contract to Aimpoint[redacted]

7. The Army also is planning to [redacted]

8. Accordingly, L-3 seeks preliminary and permanent injunctive relief against this flawed procurement and the Army in the form of one or more orders: (i) granting L-3's Motion for preliminary injunctive relief and suspending any performance by the Army under the Contract; (ii) granting L-3's Motion for permanent injunctive relief, finding that L-3 should be reinstated in the competitive range; and (iii) granting such other relief as this Court deems just and appropriate under the circumstances.

9. Performance by the Army and failing to return L-3 to the competitive range will harm L-3.

10. The Army, by contrast, will suffer no cognizable harm if the Court grants injunctive relief.

11. Injunctive relief also is in the public interest because the public has an interest in preserving the integrity of the procurement process by requiring the government to follow its procurement laws and regulations. The Army's numerous errors throughout the procurement have cast a pall on the integrity of this procurement.

**JURISDICTION**

12. This Court has jurisdiction over this bid protest pursuant to 28 U.S.C. § 1491(b).

**PARTIES**

13. Plaintiff, L-3 Communications EOTech, Inc., is a wholly-owned subsidiary of L-3 Communications Corporation. EOTech has its headquarters at 1201 East Ellsworth Road, Ann Arbor, MI 48105.

14. The Defendant is the United States of America, acting through the Department of the Army.

## GAO PROTEST

15. The Army notified L-3 of its exclusion from the competitive range on March 17, 2008. L 3 submitted a timely written request for a debriefing in accordance with FAR 15.505 on March 19, 2008. The Army provided L-3 with its requested and required debriefing on March 31, 2008.

16. On April 3, 2008, L- 3 filed a timely bid protest at the Government Accountability Office ("GAO") against L-3's exclusion from the competitive range. On July 14, 2008, the GAO issued an opinion denying the protest. That opinion is erroneous as a matter of fact and law.

## THE SOLICITATION

17. This is a procurement to supply optical reflex sites to be mounted for use on the U.S. Army M16 series rifle and M4 carbine.

18. The Solicitation required offerors to submit a proposal comprising six volumes of data, as well as to provide "twenty (20) identical and complete Bid Samples that meet the Essential Criteria and Rated Criteria in Section M and identified in [Purchase Description ("PD")] 115." Exh. 3 (RFP § L).[1]

19. L-3 has supplied more than 85,000 similar sights to various branches of the Department of Defense including the Army, Marine Corps, Air Force, Navy, and Special Operations Command. Overall, L-3 has manufactured and delivered more than 400,000 to military, federal law enforcement, and commercial customers.

---

[1] The references to Exhibits ("Exh.") in this Complaint are to the exhibits accompanying L-3's Memorandum Of Points And Authorities In Support of Plaintiff's injunctive motions filed herewith.

20. Section M of the Solicitation establishes the evaluation criteria. "The award will be made based on the best overall (i.e. best value) proposal that is determined to be the most beneficial to the Government," on the basis of the following six evaluation factors, in decreasing order of importance: Bid Sample, Quality System, Equipment/Production, Price, Performance Risk, and Small Disadvantaged Business Participation. Exh. 3 (RFP § M.A). The Bid Sample Factor included two subfactors – an Essential Criteria Subfactor that was rated Pass/Fail and a Rated Criteria subfactor that tested Battery Performance, Battery Type, Shock, Drop Requirement, Signature, Applied Force, and Human Systems Integration. Exh. 3 (RFP § M.B). "To receive consideration for award, a rating of Pass must be achieved under the Bid Sample Factor, Essential Criteria subfactor." Exh. 3 (RFP § M.A).

21. The bid samples were to be evaluated "using the same test procedures, test equipment, methodology, mounting setup and personnel for each subfactor." Exh. 3 (RFP § M.C.1.0). To pass the first Bid Sample Factor subfactor, an offeror's samples had to receive a Pass on each of 15 Essential Criteria, including Mounting and Endurance-Live Fire.

22. With respect to Mounting, the Solicitation said nothing about the equipment being "hand tightened" to secure it to the weapon, and the RFP was silent with respect to the amount of torque to be applied to do so. Rather, the RFP required the "bid sample sight mount shall be attachable and detachable to the MIL-STD-1913 rail [on the M4 Carbine] without the use of special tools. Additional hardware must be provided for mounting the optic on the M16A2 rifle carry handle without using special tools." Exh. 3 (RFP § M.C.1.1.7) (emphasis added). "Special Tools" were defined as tools "not contained in the armorer tool kit .... Adapting the optic mount(s) and/or optic to either the MIL-STD-1913 rail or the M16A2 carrying handle may use special tools such as a knife, hex key or similar tools; at the armorer level only. Attachment and

detachment of the optic [but not the mount] to the weapon by the operator in the field shall require no special tools." *Id.* Typically, sight mounts would be attached to M16A2 weapons by an armorer with his tools.

23. L-3's optics have an integral mount that fits on the M4's MIL-STD-1913 "Picatinny" rail. The M16A2 does not have a Picatinny rail. Instead, it has a carrying handle to which a cantilever (or "gooseneck") mount must be attached. Hence the reference in M.C.1.1.7 that "Additional hardware must be provided for mounting the optic on the M16A2 carry handle...." The optics then are fit onto this cantilever mount. The mount itself is secured with a lock nut. A picture of the mount with its knurled lock nut (with four equidistant openings – two visible – to insert a tool) is in Exh. 19 (L-3 Technical Drawings).

24. The Endurance-Live Fire requirement stated: "The bid sample shall be mounted on the M16A2 Rifle and shall withstand a 6,000 round endurance firing with no physical damage and maintain zero within 1 Gunner's mil upon completion of endurance test. This test shall be also performed on the M4 Carbine." Exh. 3 (RFP § M.C.1.1.10).

25. Four offerors – Aimpoint, L-3, [redacted] – submitted a total of seven offers under the Solicitation. Aimpoi[redacted] During testing, all but one of the offers, Aimpoint A, failed one or more of the essential criteria tests. L-3's optic passed each test, including the Endurance Live Fire requirement on the M4 carbine, except one – the Endurance Live Fire on the M16A2. Similarly, anothe[redacted]

[redacted]

26. Aimpoint [redacted]

27. Aimpoint [redacted]

28. In its Competitive Range determination, the Army recognized Aimpoint [redacted]

29. The Army decided that these issues [redacted] The Source Selection Authority ("SSA") also determined, however, [redacted]

30. The Army also decided that this Aimpoint [redacted]

31. During the March 31 debriefing, L 3 was informed it had passed all the Bid Sample Factor Essential Criteria with the exception of the Endurance-Live Fire criterion for the M16A2 rifle. Exh. 9 at Slide 14 (Debriefing Slides). The Army did not evaluate L-3 further "due to a failure in the essential criteria." *Id.* at Slide 16.

32. The test results for the Endurance-Live Fire test reflected that L-3 was well within the required margin after the 6000-round test when its sight was attached to the MIL-STD-1913 rail on the M4 Carbine. *Id.* at Slide 14; *see also* Exh. 23 (Essential Criteria Chart). However, when mounted on the M16A2 carry handle, L-3's bid sample was outside the required specification. During the debriefing, the Army stated, for the first time, that it had "hand-tightened" the bid samples on both the M4 Carbine rail and the M16A2 carry handle, without using any of the allowable tools contained in the armorer tool kit.

33. Recognizing that this error on the part of the Army caused the failing test results, L-3 asked the Army to retest its bid sample with the M16A2 after properly securing the mount to the carry handle. The Army refused.

34. All offerors must be evaluated (tested) equally and in accordance with clear evaluation criteria. The Army admitted at the debriefing that it applied a test criterion – hand-tightening – that is nowhere to be found in the Solicitation and that cannot be reasonably inferred.

35. Furthermore, given human variability, there is no conceivable way that even if one could infer this criterion, each of the 20 samples required to be submitted by each offeror could be hand tightened uniformly, particularly since each offeror proposed products of varying designs.

36. In the supplemental instructions L-3 provided with its bid samples for the M16A2 mount, the Army was instructed to: "1. Remove the locking nut"; "2. Install the cantilever mount to the carry handle as shown"; and "3. Secure the locking nut." Exh. 24 (Supplemental Instructions) (emphasis added). Secure means to tighten so it does not come loose. To secure the locking nut sufficiently, the Army needed to use a permissible tool – for example, a "hex key." Exh. 3 (RFP § C.1.1.7). This is evident from the round locking nut with its four prominent indentations that plainly are designed to accept unspecialized tools, even the nose of a cartridge. This form of lock nut is standard in the industry. The Army, however, ignored these facts and made the faulty and unstated assumption that it could secure the locking nut with random, unspecified hand-tightening alone. The results of this assumption, and the ensuing test results, were demonstrably flawed.

37. The M16A2 test results themselves, when compared with those for L 3's identical sight on the M4 Carbine, revealed there was a problem with the Army's testing methodology. The accuracy requirement was to maintain zero (the point of aim) within 1 Gunner's mil. RFP C.1.1.10. L-3's sight on the M4 provided results well within this requirement o[redacted] respectively, for the 2,000, 4,000, and 6,000 round tests. In contrast, the identical sight on the M16A2 resulted in [redacted] for 2,000, 4,000 and 6,000 round tests.

38. The only – and obvious – way this extreme degree of variance can occur with identical optics on two weapons with different mounts is because of an improperly mounted sight on the failing one.

39. Yet, the Army did not make minimal efforts to ensure there was no error on its part leading to the failing test results. It failed even to pose a question – *i.e.*, seek permissible clarification in accordance with FAR 15.306(b)(2) – to L 3. One simple call or email to L-3 to clarify whether hand-tightening would be sufficient to the secure the mount (particularly in light of the hex key openings) to the M16A2's carry handle would have solved the problem. Similarly, a routine inspection of the locking nut during extended firing would have revealed that it was not sufficiently secure. Had the Army taken any of these steps, it could have immediately retested L-3 bid sample to get the proper results, and thus maximized competition.

40. There is no dispute that had the Army properly secured L-3's gooseneck mount on the M16A2, L-3's sight would have passed the Endurance Live Fire test just as it did on the M4. This is demonstrated by [redacted]

**<u>COUNT I</u>**

**THE ARMY APPLIED UNSTATED, NONUNIFORMED EVALUATION CRITERIA; IMPROPERLY CONDUCTED ITS TESTING; <u>AND FAILED TO ENGAGE IN CLARIFICATIONS</u>**

41. L-3 realleges each and every allegation set forth in paragraphs 1 through 40 above as if set forth herein in their entirety.

42. Although FAR 15.306(c) allows an agency to establish a competitive range of only the most highly rated proposals, the agency's determination must be reasonable and in accordance with the RFP evaluation criteria. No deference is given to evaluation of bid samples if the record establishes that the agency's judgment was without a basis in fact, or that samples are not fairly and conscientiously evaluated in accordance with the RFP.

43. The Army's evaluation of L-3's bid sample test results for the Endurance Live Fire Test was improper because the Army applied a testing method – "hand tightening" – that was nowhere stated in the RFP and that in any event cannot reliably or uniformly be applied from sight to sight or offeror to offeror.

44. The application of that test to L-3 samples did not represent the fair or conscientious evaluation because the Army failed to secure the sample properly to the M16A2.

45. Because the Army never fairly tested L-3's sight on the M16A2, the test results cannot support eliminating L-3 from the competitive range.

46. The Army's decision to exclude L-3 from the competitive range was arbitrary, capricious, an abuse of discretion, and otherwise in violation of procurement laws and regulations because the Army failed to adhered to the RFP and based its decision on a faulty evaluation of L-3.

47. The Army's decision to exclude L-3 from the competitive range was arbitrary, capricious, an abuse of discretion and otherwise in violation of procurement laws and regulations because the Army failed to engage in clarification with L-3 about securing the M16A2 mount.

## COUNT II

## THE ARMY ENGAGED IN IMPROPER DISPARATE TREATMENT

48. L-3 realleges each and every allegation set forth in paragraphs 1 through 47 above as if set forth herein in their entirety.

49. The Army has determined to award the Contract to Aimpoint [redacted] This means, under the RFP, that the Aimpoint sight cannot meet requirements [redacted]

50. Proceeding in this circumstance with Aimpoint while excluding L-3 without clarifications is arbitrary, capricious, an abuse of discretion, and disparate treatment otherwise in violation of procurement laws and regulations.

51. The Army has determined to award the Contract to Aimpoint based on [redacted] This is arbitrary capricious, an abuse of discretion and disparate treatment otherwise in violation of procurement laws and regulations.

52. The Army is proposing to have [redacted] This is arbitrary capricious, an abuse of discretion and disparate treatment otherwise in violation of procurement laws and regulations.

## PRAYER FOR RELIEF

WHEREFORE, L-3 by this Complaint requests that the Court grant:

(1) L-3's Motion for Temporary Restraining Order or Preliminary Injunction, suspending any performance by the Army under the Contract during the pendency of this action;

(2) L-3's Motion for Permanent Injunctive and Declaratory Relief, finding that excluding L-3 from the competitive range was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, and therefore is invalid; and directing that the Army include L-3 in the competitive range or, alternatively directing retesting of L-3's sight after properly securing the mount and sight to the M16A2; and

(3) Any such other relief as this Court deems just and appropriate under the circumstances.

Respectfully submitted,

W. Jay DeVecchio

JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, DC 20001
(202) 639-6893
(202) 637-6365 (fax)

Counsel for Plaintiff
L-3 Communications EOTech Inc.

Of Counsel:

Kevin C. Dwyer
Daniel E. Chudd
Damien C. Specht

JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, D.C. 20001-4412

July 15, 2008

**Certificate of Service**

I hereby certify that a copy of the foregoing Complaint for a Temporary Restraining Order and Injunctive and Declaratory Relief was served this 15th day of July 2008 by hand delivery on:

Roger A. Hipp
Trial Attorney
U.S. Department of Justice
Civil Division, Commercial Litigation Branch
1100 L Street, NW, Room 10112
Washington, DC 20530
tel: 202/305-3091/fax: 202/514-8640

W. Jay DeVecchio