REDACTED VERSION

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| L-3 COMMUNICATIONS EOTECH, INC., Plaintiff, v. THE UNITED STATES OF AMERICA, Defendant. | Civil Action No. 08-515 **FILED UNDER SEAL REQUEST FOR PROTECTIVE ORDER PENDING** |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF**
**PLAINTIFF'S MOTIONS FOR A TEMPORARY RESTRAINING ORDER**
**AND INJUNCTIVE AND DECLARATORY RELIEF**

JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, D.C. 20001-4412

(202) 639-6893 Telephone
(202) 637-6365 Protected Facsimile

Counsel for Plaintiff
L-3 Communications EOTech, Inc.

Of Counsel:

W. Jay DeVecchio
Kevin C. Dwyer
Daniel E. Chudd
Damien C. Specht

JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington D.C. 20001-4412

# TABLE OF CONTENTS


Table of Authorities .......... iii

EXHIBITS .......... v

I. PRELIMINARY STATEMENT .......... 1

II. STATEMENT OF THE QUESTIONS .......... 3

III. STATEMENT OF THE CASE .......... 3

A. The Parties .......... 3

B. Overview of the Solicitation. .......... 4

C. The Evaluation Criteria. .......... 4

D. Testing and Evaluation. .......... 6

E. Competitive Range Decision. .......... 7

F. Debriefing. .......... 9

G. The GAO Protest .......... 10

IV. ARGUMENT .......... 12

A. Jurisdiction and Standard of Review. .......... 12

B. L-3 Likely Will Prevail on the Merits. .......... 14

1. L-3's Exclusion from the Competitive Range Based on the Results of the Endurance Live Fire Test Was Arbitrary and Capricious, an Abuse of Discretion, and Contrary to Procurement Law .......... 16

a. The Army's Methodology of Hand-Tightening Was Irrational. .......... 16

b. The Army Could Not Rationally Rely on Its Own Hand-Tightening Methodology. .......... 18

i. People, and their hands, are different. .......... 18

ii. Knobs are different, too .......... 20

c. The Army Should Have Known from the Results of Its Endurance Live Fire Test That There Was a Problem with Its Test Procedures. ....21

2. The Army's Decision Not to Contact L-3 with One Clarifying Question Was Arbitrary and Capricious and an Abuse of Discretion. ....22

3. The Army's Decision to Award the Contract to [redacted] Aimpoint Design Reflects Disparate Treatment of the L-3 and Aimpoint Proposals. ....24

a. The Intended Awardee [redacted] ....24

b. The Army Intends to Select an Optical Sight Design that [redacted] ....30

i. [redacted] ....31

ii. [redacted] ....33

iii. The Army's plan to award the contract to a [redacted] exposes improper disparate treatment. ....34

C. L-3 Will Suffer Irreparable Harm. ....35

D. Any Purported Harm to the Army Is Minimal. ....36

E. Injunctive Relief Is in the Public's Best Interests. ....38

F. Security. ....38

V. Conclusion. ....39

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ahntech*, B-293582, Apr. 13, 2004, 2004 CPD ¶ 113 ....... 23

*American Fed'n of Gov't Employees v. United States*, 258 F.3d 1294 (Fed. Cir. 2001) ....... 12

*Banknote Corp. of Am. v. United States*, 365 F.3d 1345 (Fed. Cir. 2004) ....... 12

*Barnes Aerospace Group*, B-298864, Dec. 26, 2006, 2006 CPD ¶ 204 ....... 24, 28

*Bean Stuyvesant, LLC v. United States*, 48 Fed. Cl. 303 (2000) ....... 14

*Besserman Corp.*, B-237327, February 14, 1990, 90-1 CPD ¶ 191 ....... 14, 15, 23

*Chapman Law Firm v. United States*, 71 Fed. Cl. 124 (2006) *rev'd in part on other grounds Chapman Law Firm Co. v. Greenleaf Const. Co.*, 490 F.3d 934 (Fed. Cir. 2007) ....... 14

*Cont'l Bus. Enter., Inc. v. United States*, 452 F.2d 1016 (Ct.Cl. 1971) ....... 15

*CXR Telecom*, B-249610, Apr. 9, 1993, 93-1 CPD ¶ 308 ....... 24

*Dynamic Marketing Serv.*, B-279697, July 13, 1998, 98-2 CPD ¶ 84 ....... 14

*Engineered Fabrics Corp.*, B-239837, B-239839, Oct. 3, 1990, 90-2 CPD ¶ 268 ....... 16, 18

*Falcon Sys., Inc.*, B-213661, 84-1 CPD ¶ 658 ....... 23

*FMC Corp v. United States*, 3 F.3d 424 (Fed. Cir. 1993) ....... 13

*Hawaiian Dredging Construction Co. v. United States*, 59 Fed. Cl. 305 (2004) ....... 37

*Hospital Klean of Texas*, 65 Fed. Cl. 618, 624 (2005) ....... 38

*Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324 (Fed. Cir. 2001) ....... 13

*Matter of Honeywell*, 47 Comp. Gen. 29, 1967 CPD ¶ 30 ....... 15

*Information Sciences Corp. v. United States*, 73 Fed. Cl. 70 (2006) ....... 35

*Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753 (2004) ....... 13

*Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166 (D.C. Cir. 1973) ....... 13

*Metcalf Construction Co. v. United States*, 53 Fed. Cl. 617 (2002) .............................................38

*OTI America, Inc. v. United States*, 68 Fed. Cl. 646 (2005)........................................................35

*Overstreet Electronic Co., Inc. v. United States*, 47 Fed. Cl. 728 (2000)..............................35, 36

*Overton Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ........................13

*Parcel 49C Ltd. Partnership v. United States*, 31 F.3d 1147 (Fed. Cir. 1994)............................38

*PGBA, LLC v. United States*, 57 Fed. Cl. 655 (2003) ...............................................................35

*PGBA, LLC v. United States*, 60 Fed.Cl. 196 (2004) *aff'd* 389 F.3d 1219 (2004) ......24, 25, 26, 35

*Seattle Securities Services, Inc. v. United States*, 45 Fed. Cl. 560 (2000)...................................38

*W & D Ships Deck Works, Inc. v. United States*, 39 Fed. Cl. 638 (1997) ...................................14

**STATUTES AND REGUALTIONS**

5 U.S.C. § 706...........................................................................................................................13

5 U.S.C. § 706(2)(A)...................................................................................................................13

28 U.S.C. § 1491(b) ...................................................................................................................12

28 U.S.C. § 1491(b)(1) ...............................................................................................................12

28 U.S.C. § 1491(b)(2) ...............................................................................................................13

28 U.S.C. § 1491(b)(4) ...............................................................................................................13

31 U.S.C. § 3551.........................................................................................................................12

31 U.S.C. § 3551(2)(A)...............................................................................................................12

31 U.S.C. § 3553(d)(3) ...............................................................................................................10

48 C.F.R. § 33.104(c)(1) .......................................................................................................10, 12

# EXHIBITS


1 ACQUISITION PLAN/STRATEGY[1]

2 SOURCE SELECTION PLAN

3 SOLICITATION W15QKN-07-R-0428 WITH PURCHASE DESCRIPTION

4 AMENDMENT 0001

5 AMENDMENT 0002

6 TECHNICAL EVALUATION

6.1 JUAN PATINO FINAL TECHNICAL EVALUATION MEMORANDUM DATED 14 MARCH 2008

6.2 M68 CLOSE COMBAT OPTIC PROGRAM TECHNICAL BID SAMPLE TESTING DATED 14 MARCH 2008

6.3 TECHNICAL EVALUATION-[redacted]

6.4 TECHNICAL EVALUATION-[redacted]

6.5 TECHNICAL EVALUATION-[redacted]

6.6 TECHNICAL EVALUATION-[redacted]

6.7 TECHNICAL EVALUATION-[redacted]

6.8 TECHNICAL EVALUATION-[redacted]

6.9 TECHNICAL EVALUATION-[redacted]

6.10 SOLDIER BATTLE LAB M68 CLOSE COMBAT OPTIC BID SAMPLE TEST REPORT- DECEMBER 2007

6.11 HUMAN FACTORS INTEGRATION EVALUATION OF M68 CLOSE COMBAT OPTIC CANDIDATES DATED 4 FEBRUARY 2008

7 COMPETITIVE RANGE DETERMINATION

8 UNSUCCESSFUL OFFEROR'S LETTER TO L-3 EOTECH


---

[1] Exhibits 1 through 15 correspond to GAO Agency Record Tabs produced on May 5, 2008. Exhibits 16 through 23 are other documents produced during GAO protest.

9 DEBRIEFING

10 PROTEST

11 MRL-TDR-62-17 "MAXIMUM TORQUE EXERTABLE ON KNOBS OF VARIOUS SIZES AND RIM SURFACES" DATED 1962

12 OPERATOR'S MANUAL FOR THE AN/PVQ-31A & AN/PVQ-31B RIFLE COMBAT OPTIC

13 AFFIDAVIT OF DAMIEN MARIANUCCI

14 PROPOSAL L-3 COMMUNICATIONS EOTECH

15 ITEMS FOR NEGOTIATION

16 L-3 TOTAL EVALUATED PRICE ANALYSIS

17 DECLARATION OF EDWARD SCHOPPMAN, ENCLOSING NIVISYS LIVE FIRE TEST RESULTS

18 MOUNTING INSTRUCTIONS

19 L-3 TECHNICAL DRAWING

20 L-3 TEST REPORT - RECOIL SIMULATOR TESTING

21 DECLARATION OF ROBERT SULZBACH

22 DECLARATION OF PAUL S. MANGANO

23 ESSENTIAL CRITERIA CHART

24 SUPPLEMENTAL INSTRUCTIONS

25 GAO DECISION

## I. PRELIMINARY STATEMENT

Plaintiff, L-3 Communications EOTech, Inc. ("L-3") protests its exclusion from the competitive range under Solicitation No. W15QKN-07-R-0428 (the "RFP" or the "Solicitation"), in a procurement for optical rifle sights being conducted by the United States Army Joint Munitions & Lethality Life Cycle Management Command Acquisition Center (the "Army"). This exclusion occurred solely because the Army improperly tested L-3 by using a method that was not identified in the RFP, cannot reasonably be inferred, and is impossible to apply uniformly or equally across all offerors. Excluding L-3 results in a sole source procurement to an offeror whose sight [redacted] and yet does not meet requirements [redacted]

L-3 produces an optical sight that is used throughout the military and civilian law enforcement agencies. This sight was put through an Endurance Live Fire Test on two weapons: the M4 carbine and M16A2 rifle ("M16"). The sight passed on the M4 – exceeding requirements. It failed on the M16. There is no difference in the sights (optics) on each weapon; rather there is a difference only in how they are mounted. The sight attaches directly to the top of the M4, which has a built-in mounting rail, known as a "Picatinny" rail. The M16 does not have this rail but rather has a carry handle. Therefore, the M16 requires a "gooseneck" sight mount that is attached to the carry handle. A picture of this mount is included as Exh. 19 (L-3 Technical Drawing). L-3's M16 mount was improperly secured by the agency, which elected without informing offerors to hand tighten the mounts. It was solely and exclusively because the Army hand tightened L-3's mount – which loosened during testing – that the identical L-3 sight that passed with flying colors on the M4 failed on the M16.

The decision to exclude L-3 from the competitive range for this reason was arbitrary and capricious, an abuse of discretion and in violation of procurement law and regulation. First, the

Army's chosen methodology of hand-tightening L-3's sight for the Endurance Live Fire test on the M16 was irrational. Not only is the record devoid of any indication that simply hand tightening would be sufficient, but it is impossible to apply this methodology consistently. Moreover, the results of the testing necessarily revealed that L-3's M16 mount was coming loose, thus revealing an obvious flaw in the Army's testing methodology.

The Army could have cured its error with one simple, clarifying question to L-3 about securing its mount to the M16. Such a question is appropriate under Federal Acquisition Regulation ("FAR") 15.306(b)(2), which contemplates communications with offerors to "facilitate the Government's evolution process." The Army's decision not to ask, or indeed to do anything, was arbitrary and capricious and an abuse of discretion.

To make matters worse, the Army's evaluation reflects grossly disparate treatment between L-3 and Aimpoint. ***First***, by excluding L-3, only one offer, the "Aimpoint A" sight, is included in the competitive range. Therefore, this is now a sole source procurement with a competitive range of one. Yet, indisputably, Aimpoint [redacted] The Army has nonetheless determined that [redacted] ***Second***, the record also demonstrates that [redacted] Such disparate treatment has no place in a properly conducted procurement, much less in one already tainted by improper testing.

## II. STATEMENT OF THE QUESTIONS

Was the Army's decision to exclude L-3 from the competitive range on the basis of unstated and flawed testing procedures arbitrary and capricious, an abuse of discretion, or violative of procurement law or regulation?

Was the Army's decision not to ask L-3 a clarifying question, in accordance with FAR 15.306, regarding the proper installation of L-3's sight arbitrary and capricious, an abuse of discretion, or violative of procurement law or regulation?

Was the Army's decision to keep only one offeror in the competitive range arbitrary and capricious, an abuse of discretion, or violative of procurement law or regulation when this offeror's sight [redacted]

Does the balance of harms weigh in favor of granting L-3's requests for a Temporary Restraining Order and Preliminary Injunction against the Army's continuation of the procurement and award of the contract prior to a decision on the merits of the protest?

Is a Temporary Restraining Order and Preliminary Injunction in the public's best interests?

## III. STATEMENT OF THE CASE

### A. The Parties

Plaintiff, L-3 Communications EOTech, Inc., is a wholly owned subsidiary of L-3 Communications Corporation. L-3 Communications EOTech, Inc. has its headquarters at 1201 East Ellsworth Road, Ann Arbor, MI, 48105. The Defendant is the United States of America, acting through the Department of the Army, Joint Munitions & Lethality Life Cycle Management Command Acquisition Center.

**B. Overview of the Solicitation.**

This is a procurement to supply optical reflex sights, incorporating a red aiming reference, to be mounted on the U.S. Army M16 series rifle and M4 carbine. The Army intends to award one or two contracts as a result of the Solicitation, with a minimum ordering obligation quantity of 100,000 units for one contractor, or 50,000 units per award for two contractors. Exhibit ("Exh.") 3 (RFP § A).

The Solicitation required offerors to submit a proposal comprising six volumes of data, as well as to provide "twenty (20) identical and complete Bid Samples that meet the Essential Criteria and Rated Criteria in Section M and identified in [Purchase Description ("PD")] 115." Exh. 3 (RFP § L).

L-3 has supplied more than 85,000 similar sights to various branches of the Department of Defense including the Army, Marine Corps, Air Force, Navy and Special Operations Command. Overall, L-3 has manufactured and delivered more than 400,000 units to military, federal law enforcement and commercial customers.

**C. The Evaluation Criteria.**

Section M of the Solicitation establishes the evaluation criteria. "The award will be made based on the best overall (i.e. best value) proposal that is determined to be the most beneficial to the Government," on the basis of the following six evaluation factors, in decreasing order of importance: Bid Sample, Quality System, Equipment/Production, Price, Performance Risk, and Small Disadvantaged Business Participation. Exh. 3 (RFP § M.A). The Bid Sample Factor included two subfactors – an Essential Criteria Subfactor that was rated Pass/Fail and a Rated Criteria subfactor that tested Battery Performance, Battery Type, Shock, Drop Requirement,

Signature, Applied Force, and Human Systems Integration.[2] Exh. 3 (RFP § M.B). "To receive consideration for award, a rating of Pass must be achieved under the Bid Sample Factor, Essential Criteria subfactor." *Id.* (RFP § M.A).

The bid samples were to be evaluated "using the same test procedures, test equipment, methodology, mounting setup and personnel for each subfactor." *Id.* (RFP § M.C.1.0). To pass the first Bid Sample Factor subfactor, an offeror's samples had to receive a Pass on each of 15 Essential Criteria, including Mounting and Endurance-Live Fire.

With respect to Mounting, the Solicitation said ***nothing*** about the equipment being "hand tightened" to secure it to the weapon, and the RFP was silent with respect to the amount of torque to be applied to do so. Rather, the RFP required the "bid sample sight mount shall be attachable and detachable to the MIL-STD-1913 rail [on the M4 Carbine] without the use of ***special*** tools. Additional hardware must be provided for mounting the optic on the M16A2 rifle carry handle without using special tools." *Id.* (RFP § M.C.1.1.7) (emphasis added). "Special Tools" were defined as tools "***not*** contained in the armorer tool kit .... Adapting the optic mount(s) and/or optic to either the MIL-STD-1913 rail or the M16A2 carrying handle may use special tools such as a knife, hex key or similar tools; at the armorer level only. Attachment and detachment of the ***optic*** [but not the ***mount***] to the weapon by the operator in the field shall require no special tools." *Id.* Typically, sight mounts would be attached to M16 weapons by an armorer with his tools.

The Endurance Live Fire requirement stated: "The bid sample shall be mounted on the M16A2 Rifle and shall withstand a 6,000 round endurance firing with no physical damage and

---

[2] The Equipment/Production Factor also included two subfactors: "Equipment and Facilities" and "Production Capabilities." Exh. 3 (RFP § M.B).

maintain zero within 1 Gunner's mil after 2,000 rounds. This test shall be also performed on the M4 Carbine."[3] Exh. 5 (RFP, Amend. 0002 at § M.C.1.1.10).

**D. Testing and Evaluation.**

Four offerors – Aimpoint, L-3, [redacted] – submitted a total of seven offers under the solicitation. Aimpoint [redacted] During testing, all but one of the offers, Aimpoint A, failed one or more of the essential criteria tests. Exh. 6.1 at first and second unnumbered pages (Technical Evaluation). L-3's optic passed each test, including the Endurance Live Fire requirement on the M4 carbine, except one – the Endurance Live Fire on the M16. *Id.* at first unnumbered page. [redacted]

Aimpoint A, the only offer to have passed all of the essential criteria, received [redacted]

[3] One Gunner's Mil is equivalent to approximately 3.5 minutes of angle ("M.O.A.") A minute of angle, in turn, is one inch at 100 yards.

[redacted] Aimpoint A's problems, according to the technical evaluation team, [redacted] Thus, the technical team stated [redacted]

E. **Competitive Range Decision.**

The Army made its official Competitive Range determination on March 17, 2008, eliminating all but Aimpoint A from the competitive range. In the decision, the Army recognized Aimpoint A's [redacted]

[redacted]

[redacted] The Army decided that these issues [redacted]

[redacted]

[redacted]

The Army's [redacted]

The Source Selection Authority ("SSA") determined that although these issues [redacted]

[redacted]

The competitive range decision also revealed the Army's intention to award the contract to [redacted]

---

4 [redacted]

[redacted]

According to the Competitive Range decision, [redacted]

Finally, the Competitive Range Determination revealed that Aimpoint A's [redacted]

**F. Debriefing.**

The Army notified L-3 of its exclusion from the competitive range on March 17, 2008. L-3 submitted a timely written request for a debriefing in accordance with FAR 15.505 on March 19, 2008. The Army provided L-3 with its requested and required debriefing on March 31, 2008.

During the March 31 debriefing, L-3 was informed it had passed all the Bid Sample Factor Essential Criteria with the exception of the Endurance Live Fire criterion for the M16 rifle, and the Army did not evaluate L-3 further "due to a failure in the essential criteria." Exh. 9 at Slides 14 & 16 (Debriefing Slides).

During the debriefing, the Army stated, for the first time, that it had "hand-tightened" the bid samples on both the M4 Carbine rail and the M16 carry handle, without using any of the

allowable tools contained in the armorer tool kit. Upon hearing this, L-3 explained that the tools in the armorer's kit could and should have been used to secure L-3's mount to the M16 carry handle, and noted additionally that the troops can tighten without the need for special tools.[5] L-3, therefore, requested the Army retest its bid sample on the M16 after properly securing the mount to the carry handle. The Army refused to retest, even though a retest is simple to perform. It requires a lane at a rifle range and a day or two of shooting.[6]

[redacted]

### G. The GAO Protest.

On April 3, 2008, L-3 timely filed its initial protest with the Government Accountability Office ("GAO"). The Army stayed performance pending resolution of the protest at GAO. 31 U.S.C. § 3553(d)(3); 48 C.F.R. § 33.104(c)(1). On May 5, 2008, the Army submitted its first Agency report and a portion of the record. On the basis of these documents, on May 15, 2008, L-3 filed a supplemental protest and its Comments on the Agency Report.

---

[5] In the field, even the nose of a cartridge could be used as a non-special tool to secure the mount properly.

[6] Although L-3 has no proof of bias by the Army and thus is not alleging it, the Company is nonetheless deeply concerned that the Army's actions toward it, over a number of years, appear less than forthright. There is a history of debatable conduct by the Army in prior procurements, all seemingly directed in favor of Aimpoint and against L-3. But that aside, there is simply no question when one cuts through things here that, once the Army was told by L-3 that hand tightening the M16 mount was insufficient, the Army could easily have retested the M16. Respectfully, an objective agency with the best interest of the United States and competition in mind would have no reason not to do so. No matter what objections are conjured up by the Army, securing a lane on an Army rifle range for a day or two is not an impediment unless one wants it to be.

On May 23, 2008, the Agency submitted its supplemental agency report. On June 2, 2008, L-3 filed its Comments on the Agency's supplemental report. At the direction of the GAO, on June 13, 2008, the Agency for the first time submitted the mounting instructions for all the offerors. On June 16, 2008, the GAO conducted a teleconference with the parties. During that teleconference, [redacted]

On June 20, 2008, the Army informed GAO and L-3 that it would not be taking corrective action and submitted a filing attempting to distinguish between the Aimpoint A and Aimpoint C proposals. On June 27, 2008, L-3 responded to the last two Army filings.

On July 14, 2008, the GAO issued a decision denying L-3's protest. The GAO concluded that L-3's concerns regarding the Endurance Live Fire test were the result of L-3 not sufficiently describing how to secure the locking nut and not because of agency error. *See* Exh. 25 at 4 (GAO Decision). The GAO's decision is erroneous in many respects, as will become evident. The GAO also addressed many of L-3's arguments with nothing more than a footnote and, at that, got things wrong.

For example, regarding L-3's challenges to the agency's decision and ability to hand-tighten the equipment, the GAO refers to Mr. Marianucci's declaration, glibly stating the agency had "explained the steps it took to ensure consistency, and we find this approach to be

reasonable." *Id.* at 3 n.5. This is no analysis at all, and wholly ignores the obvious flaws L-3 raised about Mr. Marianucci's methodology and conclusions. *See infra* Part IV.B.1.b. Similarly, in determining the testing results did not evince any errors, the GAO stated "each of the other offerors submitted mounting instructions that identified when hand-tightening was appropriate, when tools were required, what tool was to be used, and how to use the tool to tighten the particular nut, screw, or bolt." Exh. 25 at 3 (GAO Decision). As will be shown, the GAO is simply and demonstrably incorrect. *See infra* Part IV.B.3.b. The GAO also relied on the fact that L-3's design included a locking nut with "knurled" ridges in crediting the Army's decision to use only hand-tightening; but the GAO ignored the record evidence advanced by the Army itself that a locking nut like L-3's – with both "knurled" ridges and indentations for tool insertion, like L-3's – is properly installed first by hand-tightening and then further tightened with a tool. *See infra* Part IV.B.1.a.

## IV. ARGUMENT

### A. Jurisdiction and Standard of Review.

This Court reviews this protest under 28 U.S.C. § 1491(b)(1), which confers jurisdiction over "an action by an interested party objecting to ... any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). L-3, as an unsuccessful bidder, is an "interested party." *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1352 (Fed. Cir. 2004) (holding that the term "interested party" in 28 U.S.C. § 1491(b) has the same meaning as that term is given in 31 U.S.C. § 3551 and thus includes "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract") (quoting *American Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)). *See also* 31 U.S.C. § 3551(2)(A).

Judicial review in a protest is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). The APA standard of review requires a court to determine whether an agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court may not "substitute its judgment for that of the agency," *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (quoting *Overton Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), and may overturn an agency's decision only if "the procurement official's decision lacked a rational basis; or … the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citing *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)). If a protestor succeeds in making these showings, the Court "may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2).

On a request for a temporary restraining order, the Court must weigh the following four factors: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief. *See Alion Science and Technology Corp. v. United States.* "No one factor, taken individually, is necessarily dispositive.... [T]he weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp v. United*

*States*, 3 F.3d 424, 427 (Fed. Cir. 1993). The test is the same for a preliminary injunction. *W & D Ships Deck Works, Inc. v. United States*, 39 Fed. Cl. 638, 647 (1997).

**B. L-3 Likely Will Prevail on the Merits.**

L-3 is likely to prevail in showing that the Army's testing methodology was arbitrary and capricious, an abuse of discretion, and not in accordance with law or regulation. The Army further abused its discretion by failing to ask L-3 a simple clarifying question regarding the mounting of L-3's sight to the M16 carry handle. The product of these arbitrary and capricious actions (and inactions) was L-3's improper exclusion from the competitive range, resulting in a competitive range of only one offer.

Whenever there is a competitive range of one, the Court scrutinizes more strictly the agency's action. *See Chapman Law Firm v. United States*, 71 Fed. Cl. 124, 132 (2006) *rev'd in part on other grounds Chapman Law Firm Co. v. Greenleaf Const. Co.*, 490 F.3d 934 (Fed. Cir. 2007) ("Case law and common sense counsel that close scrutiny is appropriate where an agency has included only one firm in the competitive range, and proposes to engage in sole source negotiations with that firm."); *Bean Stuyvesant, LLC v. United States*, 48 Fed. Cl. 303, 339 (2000) ("when the government official establishes a competitive range of one offeror, the decision is subject to close scrutiny"); *Besserman Corp.*, B-237327, February 14, 1990, 90-1 CPD ¶ 191 at 4 ("we will closely scrutinize an agency determination which results in a competitive range of one."); *see also Dynamic Marketing Serv.*, B-279697, July 13, 1998, 98-2 CPD ¶ 84 at 6 (same).

In *Besserman*, the GAO noted:

> Determinations by contracting agencies that leave only one proposal within the competitive range are closely scrutinized by our Office. If there is a close question of acceptability; ***if there is an opportunity for significant cost savings***; if the inadequacies of the solicitation contributed to the technical deficiency of the

> proposal; ***if the informational deficiency could be reasonably corrected by relatively limited discussions, then inclusion of the proposal in the competitive range and discussions are in order.***

*Besserman Corp.*, 90-1 CPD ¶ 191 at 4 (quoting *Comten-Comress*, B-183379, June 30, 1975, 75-1 CPD ¶ 400 at 6) (emphases added). Similarly, in *The Matter of Honeywell*, 47 Comp. Gen. 29, 1967 CPD ¶ 30, B-161483, July 14, 1967, a lower price offeror was eliminated from the competitive range for failing one portion of a demonstration test. The protester was reinstated into the competitive range because

> [w]hen the application of a mandatory benchmark test requirement results, as in this case, in leaving one proposer, and its price is, initially at least, substantially in excess of the price of another proposer we believe the spirit and intent of 10 U.S.C. 2304(g) would not be served without further discussion to determine whether the other proposal can be improved to meet the benchmark requirement.

*See also Cont'l Bus. Enter., Inc. v. United States*, 452 F.2d 1016, 1018-21 (Ct.Cl. 1971) (Citing *Honeywell* approvingly, noting "the Government's needs are best served when 'full and free competition' exists among prospective Government contractors" in a case where six of seven proposals submitted in a bid were rejected by the contracting officer.).

The events in this procurement equally require inclusion of L-3. [redacted] Moreover, the only deficiency in L-3's proposal (if indeed there is one) is an "informational deficiency" that "could be reasonably corrected by relatively limited discussions." *Cf. Besserman Corp.*, 90-1 CPD ¶ 191 at 4. As discussed at Part IV.B.2, *infra*, the purported informational deficiency did not even require limited "discussions;" rather it could have been corrected with one clarifying question to L-3. FAR 15.306(b)(2). Consequently, excluding L-3 from the competitive range on

the basis of an irrationally conducted pass-fail test is arbitrary and capricious, an abuse of discretion and contrary to law and regulation.

The Agency's improper actions did not end with eliminating L-3 from the competitive range, however. The Army also planned to [redacted] In fact, the Army intends to award to a design that [redacted] This clear disparate treatment on behalf of the Army is arbitrary and capricious, an abuse of discretion and not in accordance with procurement law.

1. **L-3's Exclusion from the Competitive Range Based on the Results of the Endurance Live Fire Test Was Arbitrary and Capricious, an Abuse of Discretion, and Contrary to Procurement Law.**

a. **The Army's Methodology of Hand-Tightening Was Irrational.**

It is fundamental that a procuring agency must conduct tests of proposed products "in a reasonable manner." *Engineered Fabrics Corp.*, B-239837, B-239839, Oct. 3, 1990, 90-2 CPD ¶ 268 at 4. Here, the Army's endurance live fire test was unreasonable because it applied a method (hand-tightening) nowhere stated in the RFP. The Army's use of hand-tightening alone on L-3's sight mount resulted in the bid sample not being properly secured to the M16. Consequently, the results of the live fire test could not and should not have been relied upon. Stated differently, because the sight was never secured properly, the true capabilities of L-3's optic could not have been properly or fairly tested.

The record demonstrates these points. For example, nowhere in the GAO proceeding did the Army deny that hand-tightening to a particular torque was not specified in the RFP. Instead, the Army merely contended that: "[T]he *same exact testing methodology* was used for all offerors. That is, mounting instructions, as supplied by each offeror, were meticulously followed

when mounting the particular CCO bid sample to the rifles." Agency Report at 8. Thus, the Army appears to have recognized the importance of offer-specific mounting instructions to a properly conducted bid-sample test. Yet, the Army admitted that it did ***not*** apply mounting instructions tailored to each proposed sight. Instead, the Army's methodology was to "hand tighten the optic mount bid samples to the rifles" unless the offeror provided instruction to do otherwise. Agency Report at 11. Thus, the Army's case rested largely on the rationality of its assumption that hand-tightening was an appropriate mounting method for the M16A2 when no other method was specifically called out.

The Army then argued that [redacted] The "fact" on which the Army relied, however, was proven to be ***untrue*** when the Army finally submitted the mounting instructions for the other offerors. As it turned out [redacted] Consequently, using the Agency's own logic [redacted] demonstrates that choosing to hand-tighten L-3's sight was unreasonable. Accordingly, the Army's decision to

hand-tighten L-3's sight to the M16 carry handle and the subsequent testing of it were unreasonable.

Moreover, the very design of L-3's M16 locking nut puts the Army on notice that hand-tightening alone might not be sufficient for mounting on the M16 rifle. L-3's locking nut included four prominent indentations around its edge to accept a tool such as a hex key or even the bullet end of a cartridge. This is supported by the Army's own citation during the GAO protest to [redacted] As with the L-3 locking nut, [redacted] suggests that an attachment nut with both knurls and tool indentations should first be hand-tightened, and ***then*** tightened using a non-specialized tool.

**b. The Army Could Not Rationally Rely on Its Own Hand-Tightening Methodology.**

In all events, hand-tightening is arbitrary and capricious because it cannot be performed consistently, and thus the Army could have no assurance its tests were consistently applied. Furthermore, the Army's rationale for hand tightening is based on conditions that – because of the cramped design of the M16 carry handle – do not exist here.

***i. People, and their hands, are different.***

Obviously, different people have different degrees of hand strength. So, hand tightening is inherently variable. In the GAO protest, the Army contended that it ensured consistency by

having the same engineers hand-tighten the nuts on the carry handles, and that prior to testing bid samples the Army determined the maximum torque the same engineers could apply to "a typical nut found on an optic mount (i.e., of the size and rim surface of the nut provided by the protester)." Agency Report at 13. The Army concluded this was correct because the maximum torque the engineers theoretically could apply was consistent with a 1962 study on the "Maximum Torque Exertable on Knobs of Various Sizes and Rim Surfaces" ("Torque Study"). *Id.* The only support the Army provides for these points are the 1962 Torque Study and the Declaration of Damien Marianucci. Exh. 13 (Marianucci Declaration).

The Army's argument was, and remains, flawed in multiple respects. First, it assumes that hand-tightening was adequate and proper for all the bid samples, including L-3's, unless specifically told otherwise. As we have shown above, this is not the case. Setting aside this point, however, the Army's argument – that it consistently applied the same amount of torque when hand-tightening – also fails. According to Mr. Marianucci's declaration, the Army had [redacted] and this value consistent with the 1962 Air Force Torque Study. Exh. 13 at ¶ 3 (Marianucci Declaration). The 1962 study shows that the average torque exertable on a 7/8" knob was 6.56 inch-pounds of torque, with a standard deviation of 2.19 inch-pounds. Exh. 11 at Study page 7 (Torque Study).[7] In other words, according to the study, approximately 68 percent of the time a user will exert a range of force somewhere between 4.37 and 8.75 inch-pounds of torque on a 7/8" knob. *Id.* Based on standard statistical principles, however, approximately 16 percent of the time a user will exert

[7] The Torque Study measured torque in inches-ounces, showing a mean of 104.9 inch-ounces and a standard deviation of 35.1 inch-ounces. Exh. 11 at Study page 7. We have converted these values to inch-pounds for the sake of consistency with Mr. Marianucci's declaration.

*less* than 4.37 inch-pounds of torque.[8] Thus, there is a substantial risk that L-3's sight was mounted with less than 4.37 in-pounds of torque, rather than the 7 or 8 inch-pounds assumed to be sufficient by the Army. This data, and common sense, lay bare the fallacy of the Army's argument: Tightening by the human hand cannot be performed consistently enough to yield rational or fair test results.

***ii. Knobs are different, too.***

Mr. Marianucci's declaration also fails to account for the fact that the Army's experimental methodology, as well as the methodology used in the Torque Study, works only where one has unobstructed access to the knobs. The Torque Study even provides a picture of one of its participants at a testing station that demonstrates the lack of obstruction. Exh. 11 at study page 4 . While this methodology may have been appropriate for the Air Force aircraft equipment in 1962, it is inappropriate for a locking nut on the M16 carry handle. One simply cannot apply the same amount of torque to the knob under the M16's carry handle as was applied in the Torque Study. The L-3 Technical Drawing (attached as Exh. 1 to L-3's initial Protest) shows that the design of carry handle would greatly (and adversely) affect a user's ability to exert as much force on this nut than on an unobstructed knob. Exh. 19 (L-3 Technical Drawing). The height of the space in the carry handle is approximately one inch. This limited space absolutely does not allow for the full twist of one's hand, wrist, and arm that an unobstructed knob – such as those in the Torque Study – would allow. *See id.* One may in fact conclude that the locking nut on the M16 could not be hand-tightened at all; a far more apt description would be "***finger-tightened***."

---

[8] In statistics, approximately 68% of a range of values will be within plus or minus one standard deviation from the mean. *See* 68-95-99.7 rule, http://en.wikipedia.org/w/index.php?title = 68-95-99.7_rule&oldid = 208970121 (last visited May 14, 2008).

As a consequence, it was unreasonable for the Army to rely on its own "experimentally determined" value and the Torque Study to guarantee consistency with regard to the torque applied to the nut attaching the bid samples to the M16 carry handle. It simply does not even comport with common sense and experience.

**c. The Army Should Have Known from the Results of Its Endurance Live Fire Test That There Was a Problem with Its Test Procedures.**

The irrationality of the Army's Endurance Live Fire Test is equally evident from the test results themselves, and from their divergence from the results of L-3's own testing.

***First***, not only did L-3's optic pass the Endurance Live Fire requirement on the M4 Carbine, but had the mount been properly secured to the M16 the sight would have performed just as well for that test. [redacted]

***Second***, the contemporaneous record reveals that six out of the seven offers failed the Endurance Live Fire Test. Exh. 6.1 at first and second unnumbered pages (Technical Evaluation). This fact, alone, should have put the Army on notice of a potential problem with its test methodology. Furthermore, during the Endurance Live Fire testing [redacted]

[redacted]

Furthermore, as discussed *infra* [redacted] This result unmistakably demonstrates the irrationality of the tests. [redacted]

2. **The Army's Decision Not to Contact L-3 with One Clarifying Question Was Arbitrary and Capricious and an Abuse of Discretion.**

The Army could have avoided the irrationality of the testing on L-3's sight with a simple clarifying question to L-3 to determine if hand-tightening was the proper way to "secure" the locking nut on its M16A2 mount or if a hex-key or other tool should be used.

Clarifications of this nature are perfectly acceptable prior to establishing a competitive range. FAR 15.306(b)(2) allows communications "to enhance Government's understanding of proposals; allow reasonable interpretation of proposals; or facilitate the Government's evaluation process." *Id.* The section cautions only that "[s]uch communications shall not be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, and/or otherwise revise the proposal." *Id.* Here, the clarifying question the Army should have asked plainly falls into the first category, *i.e.*, a communication to enhance understanding of the proposal, allow reasonable interpretation of the proposal, or facilitate the evaluation process. *See* FAR 15.306(b)(2). There was no deficiency or material omission with

respect to the device or its capabilities, nor was there any need for L-3 to materially alter the technical or cost elements of the proposal, [redacted] *See e.g. Ahntech*, B-293582, Apr. 13, 2004, 2004 CPD ¶ 113 at 3 (concluding clarification questions seeking "amplification and clarification of [protester's] proposed manning to flesh out what was not apparent from the face of the manning chart" were not discussions). Thus, if there was a "deficiency" at all, it was a mere informational deficiency related to the meaning of the word "secure." Such a "deficiency" has nothing to do with the actual capabilities of L-3's sight. Yet, the Army chose not to ask any clarifying questions of L-3 and chose to exclude L-3 from the competitive range. This resulted in a competitive range of one offer and did not allow for any competition.

During the GAO protest, the Army did not deny that asking such a question would have resolved the issue. Nor did the Army argue that it could not have asked a clarifying question. Instead, the Army contended that the onus was on L-3 to document its proposal, and L-3 had no right to a clarifying question. The first argument is nothing more than a complaint related to a minor informational deficiency. Where a minor informational deficiency could be cured through relatively limited negotiations, inclusion in the competitive range (for the purpose of allowing a cure of the informational deficiency) is proper. This is especially the case where, as here, the competitive range would otherwise include only one offer. *Besserman Corp.*, 90-1 CPD ¶ 191 at 4-5; *see also Falcon Sys., Inc.*, B-213661, 84-1 CPD ¶ 658 at 8 (Where only one company remained in the competitive range "it is incumbent upon the agency, in the interest of maximizing competition, to keep an informationally deficient proposal in the competitive range ...."). Here, the informational deficiency not only could have been cured through limited

discussions, but the Army could have used a clarifying question prior to the testing to resolve any question it had.

The Army's second argument, that L-3 had no right to a clarifying question, further missed the point. Simply put, without clarifying the meaning of the word "secure," the Army could not reliably perform the tests. If the Army had any question about this instruction (as it clearly should have given the disparate test results between the M16 and M4), the Army should have asked a clarifying question of L-3 to ensure that the testing was performed rationally. Without doing so and ensuring proper installation, the Army could not have actually tested the true capabilities of L-3's sight.

Furthermore, procurement case law imposes special requirements for communications with offerors where, as here, the agency intends to uses pass-fail tests as a means of determining which proposals will be eligible for award. For example, as noted, in *CXR Telecom*, "benchmark testing should be an inherent part of the negotiation process, during which deficiencies should be pointed out and then corrected if possible ..., and ***benchmarks should be rerun as necessary to correct a deficiency in order to maximize competition***," B-249610, B-249610.5, Apr. 9, 1993, 93-1 CPD ¶ 308 at 11. The need to "maximize competition" is particularly acute here, where the Army's irrational testing methodology led to a competitive range of one.

3. **The Army's Decision to Award the Contract to [redacted] Aimpoint Design Reflects Disparate Treatment of the L-3 and Aimpoint Proposals.**

a. **The Intended Awardee [redacted]**

"It is a fundamental principal of government procurement law that an agency must treat all offerors equally and evaluate them consistently." *Barnes Aerospace Group*, B-298864, B-298864.2, Dec. 26, 2006, 2006 CPD ¶ 204 at 14; *PGBA, LLC v. United States*, 60 Fed.Cl. 196,

207 (Fed.Cl.2004) (noting that "uneven treatment goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion."). For example, in *Barnes Aerospace Group*, the GAO sustained the protest because the agency had insisted the protester must meet all requirements to become an approved source, but did not require the awardee to do the same. *Id.* Similarly, the Army's exclusion of L-3 from the competitive range on the basis of its Endurance Live Fire Test results, while at the same time planning to award the Contract to a design that will not ever have been tested, is both fundamentally unfair and irrational.

Although Aimpoint A passed the Endurance Live Fire Test as administered by the Army, Aimpoint A had serious accuracy-related problems [redacted] Aimpoint A was evaluated by the Army as [redacted] Those requirements relate to the sight's ability [redacted]

According to the RFP [redacted] The evaluators determined Aimpoint A's bid sample [redacted]

[redacted] The problems, according to the technical evaluation team, [redacted] Thus, the technical team stated [redacted] at [redacted] As with Aimpoint, L-3's optics also require no modification as they passed the Endurance Live Fire Test on the M4 Carbine. And there is no contention they were the cause of the M16 results. But, in contrast to Aimpoint, L-3's M16 gooseneck attachment [redacted]

In its Competitive Range determination, the Army recognized Aimpoint A's [redacted] The Army concluded these issues [redacted]

The Army's [redacted]

The Source Selection Authority determined these issues [redacted]

[redacted]

Thus, it is plain the Army intends to select Aimpoint A [redacted][10] It is equally apparent [redacted]

---

9 [redacted]

10 [redacted]

[redacted] This decision reeks of disparate treatment. It is both fundamentally unfair and improper for the Army to exclude L-3's design from the competitive range on the sole basis that if failed the Endurance Live Fire Test, while making award to a design [redacted] *See e.g., Barnes Aerospace Group*, 2006 CPD ¶ 204 at 14.

The Army's decision [redacted] is particularly irrational for two additional reasons: ***First*** [redacted] Indeed, soldiers testing the Aimpoint A design, [redacted]

[redacted]

[redacted] Similarly, the Army's technical evaluators [redacted] It is therefore obvious tha [redacted]

***Second***, [redacted]

[redacted] The Army therefore has no reason to be confident [redacted] Aimpoint design will [redacted]

In the GAO protest, the Army attempted to explain why the required Aimpoint A [redacted] The explanation, however, only served to highlight the disparate treatment.

The Army contended [redacted] there are no problems with L-3's optic itself and none asserted by the Army. Moreover, [redacted] when properly attached to the M16A2 carry handle, L-3's gooseneck attachment and optic meet the requirements for the Live Fire Endurance test. [redacted] Thus, L-3's proposa [redacted] it requires only that it be attached properly by tightening the locking nut [redacted]

Despite these facts, the Army excluded L-3 from the competitive range for a purported informational deficiency related to the M16A2 gooseneck attachment. Yet, the Army also determined the Aimpoint A [redacted] This

disparate treatment is arbitrary and capricious, an abuse of discretion and not in accord with procurement law and regulation.

In all events, the record provides no evidence, contemporaneous or otherwise, to show that [redacted] The failures of Aimpoint A's bid sample [redacted] Moreover, as the facts have shown, extremely minor changes in tightening or design may have a large enough effect on tests of accuracy, [redacted] as to be the difference between passing and failing. For example, by simply [redacted] the gooseneck would have been secured properly and L-3 would have passed the Endurance Live Fire test. [redacted]. Similarly, as discussed further below, a difference in design [redacted] Consequently, even if [redacted] to Aimpoint A's bid sampl[redacted] there is simply no reason for the Agency to assume [redacted] The Army's determination to do so exhibits grossly disparate treatment of L-3 and Aimpoint.

**b. The Army Intends to Select an Optical Sight Design that [redacted]**

The Army's disparate treatment of Aimpoint and L-3 did not stop there. The Agency Record also reveals the Army actually intends to purchas[redacted]

*i.* [redacted]

In the Army's contemporaneous test report, the testers noted that [redacted] Specifically, [redacted]

[redacted]

In the GAO protest, the Army initially disputed its own evaluation reports stating: [redacted] In a subsequent submission, accompanied by the declaration [redacted]

[redacted] the Army contended that [redacted][11]

[redacted]

[redacted]

11 [redacted]

[redacted]2

*ii.* [redacted]

The Army cannot now rely on its post-hoc explanation of [redacted] These results can, indeed, be explained only in one of two ways, both of which are fatal to the Army's claims of rationality. ***First***, the results show that the Army's testing methodology was irrational. Based on the irrationality of the testing, not only are [redacted] but the results of L-3's Endurance Live Fire Test must be questioned as well. This is especially the case here because L-3 was eliminated from the competitive range on the basis of these irrational tests.

***Second***, if the tests were, in fact, performed in an exacting and consistent manner, as the Army contends, [redacted] But if the disparate Endurance Live Fire Test results are in fact [redacted]

---

12 [redacted]

*iii. The Army's plan to award the contract to [redacted] model exposes improper disparate treatment.*

The record also reveals the Army's intention to [redacted] According to the Competitive Range decision, [redacted]

[redacted][13] Thus, the Army intends to award the Contract not only [redacted] Such a result is obviously unreasonable and reflects disparate treatment between Aimpoint and L-3.

13 [redacted]

**C. L-3 Will Suffer Irreparable Harm.**

If this Court does not grant the injunction to stay performance of the contract pending its final decision on the merits, L-3 will suffer irreparable harm. In this context, irreparable harm is measured by the consequences that will occur if performance is allowed to proceed notwithstanding the pending protest. *See PGBA, LLC v. United States*, 57 Fed. Cl. 655, 664 (2003). The relevant inquiry in assessing irreparable harm is "whether the protesters have an adequate remedy, in the absence of an injunction." *Information Sciences Corp. v. United States*, 73 Fed. Cl. 70, 127 (2006); *OTI America, Inc. v. United States*, 68 Fed. Cl. 646, 659 (2005) (quoting *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 221 (2004), *aff'd* 389 F.3d 1219 (2004); *Overstreet Elec. Co., Inc. v. United States*, 47 Fed. Cl. 728, 743 (2000)).

Without doubt, L-3 would suffer harm due to the potential loss of the contract and the lost opportunity to compete for the contract on a level playing field. The court has recognized such harm in the protest context. *Overstreet Elec. Co.*, 47 Fed. Cl. at 744 (recognizing as irreparable injury the "potential loss of valuable business … deriv[ed] from a lost opportunity to compete in a fair competitive bidding process for a contract."). Although the Army has not yet awarded the contract, without an injunction it could do so at any time. Moreover, even if the Army would not award the Contract to Aimpoint until after the court has decided this matter, allowing the Agency to commence discussions with Aimpoint could make it more difficult for L-3 to be allowed back into the competitive range once the court finds the Army acted improperly. All parties would be best served by the Army conducting negotiations with L-3 – placed back into the competitive range – at the same time as Aimpoint rather than after negotiations with Aimpoint have already been closed.

Furthermore, L-3 will suffer reputational harm from its sight wrongfully being removed from the competitive range. Current and potential future customers of L-3's sights will be given

the mistaken impression from L-3's removal from the competitive range that there was a problem with L-3's optic. This is simply not true. Yet, as a result of the Army's errors, L-3's reputation in the industry will be injured, its ability to compete on future procurements will be diminished, and it will lose future commercial and government sales, revenues and profits. This is described in the Declaration of Paul S. Mangano, the President of L-3 EOTech, (Attached as Exh. 22).

For example, [redacted] Excluding L-3 from this competitive range will irreparably damage L-3's ability to make [redacted] Exh. 22 at ¶¶ 7-9 (Mangano Declaration). It similarly will adversely [redacted] as well as GSA contract buys. These same sights are available to and have been purchased by Army commands, brigades, and units, as well as other agencies through GSA schedule contracts. Having L-3's sight eliminated from the competitive range will irreparably affect the reputation of L-3's equipment (certainly within the U.S. Army) and thus undercut L-3's GSA market. *Id.* at 10.

**D. Any Purported Harm to the Army Is Minimal.**

The harm to L-3 in the absence of an injunction pending a decision on the merits is clearly greater than any harm to the Government or any of the awardees. The only potential harm the Government could plausibly contend it has is general delay to the procurement. But such delay, other than in exceptional circumstances, will not "warrant a denial of injunctive relief." *Overstreet Elec. Co.*, 47 Fed. Cl. at 744 ("[O]nly in an exceptional case would [such

delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests.") (citing *Ellsworth Associates v. United States,* 45 Fed. Cl. 388, 399 (1999)). Furthermore, the Army's actions throughout this protest have shown no concern for such delay.

At any time following L-3's protest the Agency could have taken corrective action by retesting L-3's sight to determine if its capabilities warranted it remaining in the competitive range. Indeed, such corrective action would have been exceedingly reasonable and in the best interests of the United States following L-3's providing independent test results showing that its sight would pass the Endurance Live Fire test when properly secured, or following the GAO's June 16, 2008, teleconference during which the GAO urged the Army to take corrective action. Retesting also would not have taken much time to perform, as proven by the Nivisys testing in two days. The Army also did not attempt to override the stay when L-3 filed its protest at the GAO. Thus, it is difficult to see any changed circumstances that now would suggest an urgent need to complete the procurement. Indeed, because L-3's protest was pre-award, the stay only barred the Army from ***awarding*** the contract. FAR 33.104(b)(1). Despite this fact, and the agency's stated need to conduct discussions with Aimpoint to attempt to resolve Aimpoint's unsatisfactory ratings, there is no indication that the Army took any steps to conduct these negotiations with Aimpoint during the pendancy of the Protest. The Army should not now be allowed to argue that it would be harmed by delay given its own failure to take these steps.

Aimpoint, as well, would not be harmed by a preliminary injunction. Aimpoint has not been awarded the Contract, let alone begun any work under the Contract. Therefore it would not incur any costs during the protest. Moreover, awardees have no legitimate interest in a contract that was improperly awarded. *See e.g., Hawaiian Dredging Constr. Co. v. United States*, 59 Fed. Cl. 305, 317 (2004) ("[I]n comparing the hardships of an injunction, the Government, Triton and

Nova [the awardees] are not harmed by aborting a flawed award process"). Therefore, L-3's harm if an injunction is not issued is far greater than that of the government or putative awardee should an injunction be issued.

**E. Injunctive Relief Is in the Public's Best Interests.**

The public has a strong interest in preserving the integrity of the procurement process by requiring the Government to follow its procurement laws and regulations. *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1153 (Fed. Cir. 1994); *Hospital Klean of Texas, Inc.*, 65 Fed. Cl. 618, 624 (2005) (granting temporary restraining order, in part, because of overriding public interest in prescribing integrity of procurement process by requiring the government to follow its regulations); *Metcalf Const. Co. v. United States*, 53 Fed. Cl. 617, 645 (2002) ("[P]laintiff has shown that granting a permanent injunction will serve the public interest by insuring that the solicitation is conducted in accordance with all federal procurement laws . . . . In granting plaintiff's prayer for relief, public confidence and competition in the federal procurement process will be preserved.") (citation omitted). *See also Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 572 (2000) ("It is beyond peradventure that the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid.").

The public interest also is plainly served by having enhanced competition – certainly more than a competitive range of one – by L-3's sight that offers equal or superior performance and that is less costly to the taxpayer.

Accordingly, the court should grant L-3's request for a preliminary injunction.

**F. Security.**

Because the Army will suffer no cognizable damage as a result of the statutorily required relief that L-3 seeks herein, the court should not require a bond under Rule 65(c).

## V. CONCLUSION.

L-3 has (1) made a substantial showing that the Army's decision to exclude L-3 from the competitive range was arbitrary and capricious, an abuse of discretion, and violative of procurement law; (2) demonstrated that the balance of harms weighs in L-3's favor; and (3) established that granting a temporary restraining order or a preliminary injunction serves the public interest. The Court, accordingly, should grant L-3's Motion for a Temporary Restraining Order and Preliminary Injunction and require that the Army stay any conduct under the procurement until such time as the Court has rendered a judgment.

Dated: July 15, 2008

Respectfully submitted,

W. Jay DeVecchio

JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, DC 20001
(202) 639-6893
(202) 637-6365 (fax)

Counsel for Plaintiff
L-3 Communications EOTech Inc.

Of Counsel:

Kevin C. Dwyer
Daniel E. Chudd
Damien C. Specht

JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, D.C. 20001-4412

**Certificate of Service**

I hereby certify that a copy of the foregoing L-3's Memorandum of Points and Authorities was served this 15th day of July 2008 by hand delivery on:

Roger A. Hipp
Trial Attorney
U.S. Department of Justice
Civil Division, Commercial Litigation Branch
1100 L Street, NW, Room 10112
Washington, DC 20530
tel: 202/305-3091/fax: 202/514-8640

W. Jay DeVecchio