# EXHIBIT 3
## (Continued)

**UPDATED 19 October 2007**

**PURCHASE DESCRIPTION AR PD 115**
**SIGHT, REFLEX WITH MOUNT, M68**

**1.0 Scope.**
This Purchase Description contains the minimum performance and quality assurance requirements for an optical reflex sight incorporating a red aiming reference (collimated dot); as well as weapon mounts and dust covers for the lens and anti-reflection device. The sight is for immediate use on US Army M16 series Rifle and M4 Carbine while using the "two eyes open" method of sighting. It will be used under all weather conditions at ranges from 0-300 meters. Application requires that the device be mountable to the M4 Carbine rail (see MIL-STD-1913) with a separate piece of mounting hardware for use on the M16A2 carry handle. Compatibility with the existing M16A2 and M4 Back Up Iron Sight (BUIS), compabtibility with 3rd generation, image intensifier systems is required. Also required, is compatibility with the three wavelength rejection band, Ballistic/Laser Protective Spectacles (BLPS).

**2.0 Applicable Documents.**

2.1 **Government Documents.**

2.1.1 **Specifications and Standards.** Unless otherwise specified, the latest revision of the following specifications and standards in that issue of the Department of Defense Index of Specifications and Standards (DoDISS) specified in the solicitation, form a part of this purchase description to the extent specified herein.

**SPECIFICATIONS**

MILITARY

MIL-PRF-13830B – Optical Components for Fire Control Instruments; General Specification Governing the Manufacture, Assembly and Inspection of

MIL-S-44366 -Spectacles, Protective, Laser, Ballistic

**STANDARDS**

MIL-STD-810 - Environmental Test Methods and Engineering Guidelines

MIL-STD-129 - Marking for Shipment and Storage

MIL-STD-2073-1- Materiel Procedures for Development and Application of Packing Requirements

MIL-STD-171 -Finishing of Metal and Wood Surfaces

MIL-STD-1913 -Dimensioning of Accessory Mounting Rail for Small Arms Weapons

2.1.2 **GOVERNMENT DOCUMENTS**

TOP 3-2-609 - Chemical Compatibility of Non-Metallic Materials

**Drawings:**
M16A2 related — 8448553, 8448567, 8448571, 8448643, 8448712, 9349050, 9349054, 9349057 through 9349064
MIL-STD-1913 Rail related--12598120 through 12598127
Zeroing Target Related - 12012024

Code of Federal Regulations (CFR):

Title 49, Parts 100-199, Transportation of Hazardous Material

2.1.3 **Other Publications.**

ASTM-D3951 -Packaging, Commercial

2.1.4 **Order of Precedence.**

In the event of a conflict between the text of this purchase description and the references cited herein, the text of this purchase description shall take precedence. Nothing in this purchase description, however, shall supersede applicable laws and regulations unless a specific exemption has been obtained.

**3.0 Requirements.**

**3.1 Optical Characteristics.**

3.1.1 Magnification. Optical power (angular magnification) shall be unity. The device shall be a reflex (non-telescopic/unit power) sight which transmits light from the target to the viewer.

3.1.2 Clear Aperture. The clear aperture of the optics through which the scene is viewed shall be within the range of 19mm (minimum) to 45mm (maximum), measured as the diameter of the largest circle which can be inscribed in the viewing side of the optic.

3.1.3 Dot Aiming Reference.

3.1.3.1 Dot Angular Spot Size. Dot size shall be between one (1) and two (2) minute of arc, ± 0.5 minute of arc. The aiming reference shall consist of a single dot.

3.1.3.2 Parallax. With the sight's azimuth and elevation adjustments set at the mid-point of travel and for a target at 300 meters (plus or minus 10 meters), parallax (apparent motion of the dot with respect to the target) when viewed by moving the eye horizontally across the exit aperture of the sight shall be:

a) a maximum of 45 seconds of arc or less across a 3.5mm radius, centrally located, area; and
b) a maximum of 3.0 minutes across the entire aperture.

3.1.3.3 Illuminance. The dot luminance shall be manually adjustable, for comfortable viewing when viewed against a background luminance over the range 0.01 to 5000 foot-lamberts. The dot luminance shall be manually adjustable for comfortable viewing through a Third Generation Image intensifier (ANPVS14 or AN/PVS7) device over the full range of amplification of the device without causing saturation of the device.

3.1.3.4 Azimuth and elevation adjustment. The line of sight shall be adjustable (without the use of tools, desired), using tactile controls with scales visible in daylight, in increments, not exceeding one (1) minute of arc for a total movement of at least the following: 60 minutes in azimuth (plus(dot moving to the left) and minus (dot moving to the right) 30 minutes from position where dot is centered in the field of view) and 60 minutes in elevation (45 minutes of adjustment in the direction in which the barrel of the weapon would elevate and 15 minutes in the direction in which the barrel of the weapon would depress).

3.1.3.5 Adjustment repeatability. With the dot centered in the field-of-view, line of sight deviation from this position shall be maintained to within 30 seconds after the following movements: 45 minutes in the direction in which the barrel of the weapon would elevate; followed by 60 minutes in the direction in which the barrel of the weapon would depress; followed by 15 minutes in the direction in which the barrel of the weapon would elevate; followed by plus 30 minutes in azimuth; followed by minus 60 minutes; followed by plus 30 minutes.

3.1.3.6 Power Source. Active or passive elements are acceptable provided all other requirements, especially paragraph 3.1.3.3 are met. The illumination power source shall be either a battery (ies) (maximum of two (2) batteries required, one (1) battery desired) or passive element which:

(a) If battery (ies) are used, battery (ies) shall be one of the following. If standard consumer 'AA' size battery(ies) are used, the optic shall be capable to accept both lithium and alkaline compositions. Batteries shall NOT be rechargeable:
(1) AA Size Battery
(2) DL1/3N Size Cell

(3) CR2032 Coin Cell
(4) CR123 Size Battery

(b) has sufficient capacity for seven days of continuous operation set on the maximum intensity level at a temperature of –50 +/-2 degrees F, (desired 720 hours of continuous use at these settings). "Sufficient capacity" is defines as remaining visible with a background scene luminance of 1,000 foot-lamberts.

(c) does not contain mercury or carbon zinc,

(d) is field replaceable (without tools) and is protected in a waterproof compartment with a removable cover or cap. The cover or cap shall be attached to the unit so as to preclude its loss when removed from the optic.

(e) is compatible with all other requirements of this document,

(f) one (1) additional battery set for a total of two (2) sets shall be supplied and packed in the same box with each sight delivered. A set is defined as the total number of batteries necessary to operate the unit.

(g) shall not automatically shut off.

(h) shall not damage the unit if the power source is replaced incorrectly.

3.1.3.7 Hue. The hue must be compatible (including target and dot visibility with ANPVS-14 image intensifier systems; and also with the three wavelength rejection band, Ballistic/Laser Protective Spectacles (BLPS). The aiming reference must appear red to the naked eye.

3.1.3.8 Signature. The dot shall not be visible at a 10 meter distance on the target side of the sight using ANPVS-14 3rd generation image intensifying night vision goggles or the naked eye, when the optic is in its middle brightness setting of the full range of settings.

3.1.4 Height Above Bore. The mechanical axis of the optic housing shall be centered 7.7cm +/- 0.50cm above the bore axis when mounted to the M16A2 carry handle and 7.0cm +/- 0.25cm above the bore axis when mounted to the MIL-STD-1913 on the upper receiver of the M4 carbine.

## 3.2 General Characteristics.

3.2.1 External coatings. The external surfaces of the sight body, lens/dust covers and mounts shall have a non-reflective black matte finish approximately number 37038, but not lighter than gray, number 36076 of FED-STD-595. Metallic surfaces shall have a final protective finish referencing MIL-STD-171. All materials and final protective finishes shall be selected so that the sight and mount meet all requirements of this

document including, but not limited to corrosion resistance, chemical resistance and NBC decontamination.

3.2.2 <u>Sealing</u>

3.2.2.1. The sight shall be conditioned at an initial temperature of 48.6 +/-3.6 degrees F higher than the water temperature, and shall remain watertight while withstanding immersion in 1.0 meter +/-76mm of 64+/-3.6 degrees F water for a period of 120 minutes (+/- 5 minutes).

3.2.2.2. Sight shall remain moisture-free internally after being exposed to an external vacuum of 4.4 pounds per sq. in. (absolute) for a minimum of 8 hours (with and without the elevation and windage alignment adjustment knobs protective caps mounted).

3.2.3 <u>Radioactive material content.</u> All glass elements and optical coatings used in the sight shall be free of Thorium and Thorium Fluoride.

3.2.4 <u>Cleanliness and optical quality.</u> Sights shall be constructed to provide a clear image free of glare from non-optical surfaces. The optical parts and entire interior shall be clean and free from dirt, dust, grease and other foreign matter. An anti-reflection device (ARD) shall be included and fit between the lens and the dust cover. This device shall be removable for cleaning. There shall be no foreign matter obvious to the unaided eye which would impair optical performance when looking into the sight against a background having the brightness of the sky in average daylight. The interior shall be free from lubricants and coatings which may bleed, outgas, chip or flake. Optical elements shall be fabricated out of optical glass.

3.2.5 <u>Materials and construction.</u> The sight shall conform to the materials and construction requirements specified herein and be in accordance with the applicable materials and construction provisions of MIL-PRF-13830B. The exterior optical surfaces shall be protected when not in use by lens/dust covers which shall be constructed of a non-reflective material. These covers shall remain in place under all environmental and handling conditions. They shall be easily removable from the sight's optical path to permit its use. The covers shall be attached to the sight/mount so as to preclude their loss when removed from the optics. The installation of covers and their position when removed from the optics shall not interfere with or degrade the optical performance or operation of the sight or any device it may be mounted on. The housing shall be built so as to completely enclose the illumination source from the outside environment.

3.2.6 <u>Lens/Dust Covers</u>. The sight shall contain lens/dust covers which shall protect the objective and eyepiece. The lens/dust covers shall be easily removable from the telescopic optical path and shall be capable of remain attached to the telescope to preclude loss and not interfere with the function of the weapon or optic.

### 3.3 Operability

3.3.1 Operability. The sight and mount shall be operable and maintainable by 5th to 95th percentile (stature) soldiers wearing Mission Oriented Protective Posture IV (MOPP IV), cold weather protective clothing (excluding Arctic Mittens), and/or corrective lenses. The sight and mount shall be free of sharp edges which could cause injury to the soldier or puncture the MOPP IV protective clothing. The sight and mount shall withstand hand generated forces (including twisting the housing) by the operator without breaking or degrading operational performance. Any switches or other operating controls (excluding azimuth and elevation adjustments) shall be operable from the normal firing positions by both right and left handed shooters. The sight shall allow for the mounting and operation of the M16A4 and M4 Back Up Iron Sight (BUIS), The PAQ-4, and the PEQ-2 IR sights, the Multiple Integrated Laser Engagement System (MILES) equipment without modification to the MILES equipment.

### 3.4 Attachment/Physical

3.4.1 Attachment. The sight mount shall be attachable and detachable to the MIL-STD-1913 rail (see drawings of 2.1.2) without the use of special tools. Additional hardware must be provided for mounting on the M16A2 Rifle carry handle without using special tools. The mounting position of the sight will provide the capability for use of the iron sights on M16A2 and the back up iron sight on the M4 Carbine, see drawing of 2.2.1 for initial zeroing and as a backup without removal of the sight. Attachment of the sight to either weapon shall not damage the MIL-STD-1913 rail or mount due to over-tightening to include deforming, nicking or scratching the rail or the mount.

3.4.2 Reattachment line of sight retention. The point of aim shall be maintained to within 0.33 gunners mils when the sight is detached from and reattached to the M16 carry handle and M4 Carbine (one at a time) through ten (10) cycles. For the M16 Carry Handle reattachment line of sight retention test, the government shall cycle the optic on and off the M16 Carry Handle at the interface where no tools are required. If the optic has multiple interface points, cycling of the optic will be performed at the point where no tools are required.

3.4.3 The sight shall be capable of being attached to both weapons by 5th to 95th Percentile (stature) soldiers wearing MOPP IV, cold weather protective clothing (excluding Arctic Mittens), and/or corrective lenses without the use of tools.

3.4.4 Applied Force. Both sight/mount configurations must be capable of withstanding a load of 25 pounds of force in horizontal, vertical and longitudinal directions about the sight without affecting point of aim by more than 0.5 gunners mils.

3.4.5 The sight shall allow for achieving a 300 meter zero using a standard 25m

M16A2/M16A4 zeroing target (2.1.2), when mounted to the M16A2 (point of aim equal to point of impact). The optic shall also deliver a 300m zero using the 25m M16A2/M16A4 zeroing chart (2.1.2) modified to place the point of impact 1.4cm below the point of aim, when mounted to the M4. Successful zeroing is defined as 7 out of 10 rounds of M855 Ball ammo striking within a diameter of 1.66 gunners mils on a target placed at 300m, as part of a single shot group. No come-ups are permitted for a successful zero.

3.4.6 Weight. Total weight of sight with mount, battery(ies), antireflective device and lens/dust covers attached shall not exceed 1.50 lbs for both the M4 and M16A2 mounting configurations, separately weighed (desired weight is 1.3 lbs or less).

**3.5 Environmental**

The sight, mount and lens/dust covers shall be capable of withstanding the following environments without physical damage and without any degradation of the performance characteristics (optical, general, operational and physical):

3.5.1 Shock. The sight and mount for the M16 carry handle and the MIL-STD-1913 rail system shall withstand three thousand (3,000) shocks in the longitudinal plane, 400 to 500 G's peak level with time duration to be 0.7 to 1.1 milliseconds. Four (4) shocks each shall be administered along the two mutually perpendicular axes, each perpendicular to the line of sight, with two impulses in each direction along the respective axis and each impulse shall be 40 plus or minus 4 G's half sine with a time duration of 11 milliseconds +/- 1 millisecond. The sight shall maintain point of aim to one (1) gunners' mil. No physical damage shall occur to the optics, housing, mount, or adjustment apparatus.

3.5.2 Vibration. The sight with mount and lens/dust covers when attached to the test equipment shall be vibrated at a constant displacement of 0.125 inch double amplitude from 10 to 30 hertz (using the M16 carry handle and the MIL-STD-1913 rail system, separately). Maintain a constant 5.75 g's from 30 to 150 hertz. Perform logarithmic sweep for 30 minutes in each of the three mutually perpendicular axial directions.

3.5.3 Temperature. The sight with lens/dust covers and mounts shall be exposed and thermally stabilized at temperatures of –40 and +160 degrees F +-2 degrees. Each exposure shall be for a minimum of 4 hours. The dot shall remain visible at the end of the test. The sight with lens/dust covers and mounts shall not suffer any physical damage from this exposure.

3.5.4 Humidity. The sight with lens/dust covers and mounts shall be subjected to five (5) continuous exposure cycles, following the temperature and sealing tests. Each cycle to be conducted as follows:

a. Subsequent to the installation of the item in a suitable test chamber, the

internal temperatures shall be gradually raised to 120 degrees F and the relative humidity to at least 95% over a period of two hours.

b. The conditions of a. above shall be maintained for not less than six (6) hours. While maintaining a relative humidity of at least 90% the internal chamber temperature shall be reduced to 68 degrees F over a period of 8 hours stabilizing at 95% relative humidity.

c. While maintaining a relative humidity of at least 90% the internal chamber temperature shall be reduced to 68 degrees F over a period of 8 hours stabilizing at 95% relative humidity.

3.5.5 NBC Decontamination. Although the sight with lens/dust covers and mounts is not required to be nuclear survivable, it shall be survivable following decontamination using the individual soldier's personal decontamination kit, M258A1 which contains solution 1(72+-2% hydroxyethane, 10+-0.5% phenol, 5+-.5% sodium hydroxide, and 0.2+-0.05% ammonia in water) and solution 2 (45+-2% hydroxyethane and 5+-0.5% zinc chloride in water). A resultant insoluble white residue on non-optical surfaces when solution 2 is used, is not a cause for failure.

3.5.6 Corrosion resistance. Sight with lens/dust covers and mounts shall be subjected to the test conditions of MIL-STD-810 salt fog requirements for 48 hours.

3.5.7 Fungus. Sight with lens/dust covers and mounts shall meet fungus resistance requirements of MIL-STD-810 for a duration of 30 consecutive days.

3.5.8 Chemical resistance. Plastic parts of sight, lens/dust covers and mounts immersion testing duration shall be 24 hours. Plastic parts of the sight, lens/dust covers and mount shall be subjected to the following: chemicals per paragraph 4.2 of TOP 3-2609:

a. Lubricant, semi-fluid, auto. wpns (item #4 of TOP Table 1)
b. Lubricant, cleaner & preservative (item #6 of TOP Table 1)
c. Insect Repellant (item #11 of TOP Table 1)
d. Lubricating oil, weapons (item #19 of TOP Table 1)

3.5.9 Sand and dust. The sight with mounts shall be subjected to Method 510.1 Dust (Fine Sand) of MIL-STD-810. The optic shall show no degradation of performance to the optic. Defects in the optical surfaces resulting from the test will not be considered cause for failure. Any dust entering and affecting the mounting systems will not be considered cause for failure unless the mounting system becomes inoperable.

3.5.10 Thermal Shock. The sight with lens/dust covers and mounts shall be stabilized at 70 degrees F for a minimum of two hours then transferred within a period of 15 seconds to –40 degrees F at which it will be stabilized for at least two hours then transferred within a period of 15 seconds to an environment of 70 degrees F (all

temperatures +-5 degrees F). The dot shall remain visible at the end of the test. The sight with lens/dust covers and mounts shall not suffer any physical damage from this exposure.

**3.6 Endurance Requirements.**

3.6.1 Live fire. Both versions (M16A2 and M4) of the sight/mount when attached to the appropriate weapon, and fired by the Government, shall withstand a 6000 round endurance firing with no physical damage and shall maintain zero within 1 Gunner's mil after completion of every 2,000 rounds.

3.6.2 Drop requirement (sight mounted to weapon). The sight/mount, when attached to the carry handle on the M16 rifle and the MIL-STD-1913 rail system on M4 Carbine with full magazine, and dropped by the Government, shall have no physical damage and shall meet all requirements of Para. 3.1, 3.2, 3.3, 3.4.1, and 3.5 of this Purchase Description when dropped (sight down) from a height of 0.6 meter (2 feet) onto dirt. Dirt shall have a minimum soil penetration resistance of 750 pounds per sq. in. at a depth between 1.0 and 1.5 inches. The sight and mount shall retain zero to within 1 Gunner's mil of arc after this drop.

**3.7 Radioactive Material Requirements.**

Should radioactive material be used as a power source, an NRC exemption license shall be provided.

3.7.1 Contamination Limits

3.7.1.1 Wipe Limit. The sight assembly shall not exceed 100 disintegrations per minute over background. Determination procedure shall be as specified in 6.2

3.7.1.2 Diffusion Limit. The sight assembly shall not exceed 50 nanocuries per day. Determination procedures shall be as specified. in para. 6.2.

3.7.2 Marking. Each sight shall be identified with a serial number. Radioactive marking and labeling shall be as specified in MIL- STD-129, except as follows: each sight shall be marked in a conspicuous location with radioactive symbol, the isotope, activity, and date of activity determination (month and year). Abbreviations may be used for the isotope tritium, H3, and activity, such as mCi for millicuries.

3.7.3 Additional Environmental Tests. Each sight is required to pass the following tests of ANSI N540 "Classification of Radioactive Self-luminous Light Sources" in addition to the other tests above:

3.7.3.1 Pressure (Reduced) Test (7.5)
3.7.3.2 Impact Test (7.6)
3.7.3.3 Immersion Test (7.8)

**3.8 Compatibility**

3.8.1 Compatibility with Laser Protection Spectacles. The sight when mounted shall be compatible with the Ballistic Laser Eye Protective Spectacles (MIL-S-44366). In addition, the dot must be visible to a user wearing Ballistic Laser Eye Protection Spectacles (MIL-S-44366).

3.8.2 Compatibility with Image Intensifier Systems. The sight shall be compatible (including optically) with the ANPVS14 or ANPVS7 image intensifier systems. Selected dot hue and sight coating(s) must permit adequate visibility of the dot and the target scene through the sight using either devices.

**4.0 QUALIFICATION REQUIREMENTS**

**4.1 Responsibility for Inspection.** Unless otherwise specified in the contract or purchase order, the contractor is responsible for the performance of all inspection requirements (examinations and tests). Except as otherwise specified in the contract or purchase order, the contractor may use his own or any other facilities suitable for the performance of inspection requirements specified herein unless disapproved by the Government. The Government reserves the right to perform any of the inspections set forth in the specification where such inspections are deemed necessary to assure supplies and services conform to prescribed requirements.

4.1.1 Responsibility for compliance. All items shall meet all requirements of Sections 3, and 5. The inspection set forth in this purchase description shall become a part of the contractor" overall inspection system or quality program. The absence of any inspection requirements in the purchase description shall not relieve the contractor of the responsibility of ensuring that all products or supplies submitted to the Government for acceptance comply with all requirements of the contract. Sampling inspection, as part of manufacturing operations, is an acceptable practice to ascertain conformance to requirements, however, this does not authorize submission of known defective material, either indicated or actual, nor does it commit the Government to accept defective material.

4.1.2 General provisions. Unless otherwise specified herein, the provisions of MIL-PRF-13830B apply and form a part of this purchase description.

**4.2 Classification of Inspections.** The inspection requirements specified herein are classified as follows:

a. First article inspection (4.3)
b. Quality conformance inspection (see 4.4).

**4.3 First Article Inspection.**

4.3.1 Submission. The contractor shall submit a first article sample as designated by the Contracting Officer for evaluation in accordance with provisions of 4.3.2.

| Part Description | Quantity |
|---|---|
| M68 Sight | 10 |

4.3.2 Inspection to be performed. As determined by the Government, the first article assemblies, components and test specimens may be subjected to any or all of the examinations and tests specified in this detail purchase description (see Table II) and be inspected for compliance with any or all requirements of the applicable drawings. A test report shall be provided to the government including the results of all tests in Table II no later than 120 days after contact award.

4.3.3 Rejection. If any assembly, component or test specimen fails to comply with any of the applicable requirements, the first article sample shall be rejected. The Government reserves the right to terminate inspection upon any failure of an assembly, component or test specimen to comply with any of the requirements.

4.3.4 Certification of Compliance (COC). The contractor shall submit, with the first article sample a certificate of compliance from the manufacturer (or a certified test report) certifying that all requirements are met.

**4.4 Quality Conformance Inspection.**

4.4.1 Inspection lot formation. The term "inspection lot" is defined as a homogeneous collection of units of product from which a representative sample is drawn or which is inspected 100 percent to determine conformance with applicable requirements. Units of product selected for inspection shall represent only the inspection lot from which they are drawn and shall not be construed to represent any prior or subsequent quantities presented for inspection. Homogeneity shall be considered to exist provided the inspection lot has been produced by one manufacturer, in one unchanged process, using the same materials and methods, in accordance with the same drawings, same drawing revisions, same specifications and specification revisions. All material submitted for inspection in accordance with this purchase description shall comply with the homogeneity criteria specified herein, regardless of the type of inspection procedure which is being applies to determine conformance with requirements.

4.4.2 Examinations and tests.

4.4.2.1 Classification of characteristics. Quality conformance examinations and tests are specified in the following Classification of Characteristics paragraphs. The contractor's quality program or detailed inspection system shall provide assurance of compliance of all characteristics with the applicable purchase description requirements utilizing as a minimum the conformance criteria specified. When cited

herein, attributes sampling inspection shall be conducted in accordance with Table I, using the inspection levels stated in the Classification of Characteristics paragraphs (see Table III).

4.4.2.2 Inspection methods. Where specified herein, inspection and test methods and procedures necessary to assure compliance with all of the requirements contained in this purchase description or specified in the contract shall be established by the contractor. Each requirement shall be carefully analyzed, and a determination made as to the methods, procedures, equipment, and sequence of inspection and tests which will best insure the acceptance of those components and products which meet the specified requirements and reject those that do not.

4.4.2.3 Alternative quality conformance provisions. Unless otherwise specified herein or provided for in the contract, alternative quality conformance procedures, methods or equipment, such as statistical process control, tool control, variables sampling or other types of sampling plans, etc., may be used by the contractor when they provide, as a minimum, the level of quality assurance required by the provisions herein. Prior to applying such alternative procedures, methods or equipment, the contractor shall describe them in a written proposal submitted to the Government for evaluation. When required, the contractor shall demonstrate that the effectiveness of each proposed alternative is equal to or better than the specified quality conformance provision(s) herein. In case of dispute as to whether the contractor's proposed alternative(s) provides equivalent assurance, the provisions of this purchase description shall apply. All approved alternative provisions shall be specifically incorporated into the contractor's quality program or inspection system, as applicable.

**5.0 Packaging.**

5.1 Preservation and Packing. The sight with mount shall be preserved to Level A Protection in accordance with MIL-STD-2073-1 and CFR 49 (if applicable). Purchased repair and spare parts shall be packed to method of preservation Method 40.

5.1.1 Packing. The Government furnished Operator's Manual is to be over packed with each sight and shall be in accordance with ASTM D 3951 and CFR 49 (if applicable).

5.1.2 Marking. In addition to any special marking required by the contract, order shall be marked in accordance with MIL-STD-129 and CFR 49 (if applicable).

**6.0 ARDEC Radioactive Contamination Determination Procedures.**

6.1 ARDEC contamination wipe procedures shall be as follows:

6.1.1 A piece of Whatman-SO filter paper, or equivalent moistened with deionized or distilled water shall be used to wipe the sight. All exterior surfaces of the sight shall be thoroughly-wiped with the filter paper. The amount of tritium contamination

on the filter paper shall be determined by using a liquid scintillation counting technique. The paper shall be placed in the liquid scintillation solution within one minute after wiping the sight. The liquid scintillation counting system shall have sufficient sensitivity to detect a lower limit of detection of 10 picocuries with a 95 percent confidence limit. This test shall be performed by the contractor on all sights. The contractor shall furnish filter paper, solution, and bottles. Disintegration rate of more than 100 dpm over background per rifle scope shall constitute failure of this test.

6.2 ARDEC diffusion test procedures shall be as follows:

6.2.1 Completed sights, with all luminous vials installed, shall be submerged in a measured volume of distilled or deionized water equal to approximately 10 times the volume of the sight for 24 hours at 23 + 5 degrees Celsius. Sights shall then be removed from the water. The water shall be analyzed in accordance with the analytical procedures defined below:

a. This is the test procedure for tritium diffusion, and if the radioactive content of the water exceeds 50 nanocuries/day, it shall constitute failure of the test.

b. The tritium content in the diffusion test will be determined using a properly operating liquid scintillation counter. The counting efficiency will be determined by measuring the amount of sample quench in the sample and applying a valid method of determining the counting efficiency based on this measured quench. This may be done by using any of the proprietary methods commonly found in liquid scintillation counters on the market. Some examples of these methods are the external standards ratio or "H" number method. The system will be calibrated periodically at least once a month using a quench standards set with the same volume and type of vial as the prepared samples. The quench standards set will have an unexpired calibration traceable to the NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY. To calibrate the tritium diffusion rate, a measured sample of the water will be placed in a glass liquid scintillation vial. Enough commercial water soluble liquid scintillation cocktail will be added to the vial to fully dissolve the sample. A background sample will also be prepared by adding the same quantities of the distilled water and scintillation cocktail to another vial. To establish an acceptable lower limit of detection of about 20 disintegrations per minute per milliliter, the minimum count time will be equal to .05 times the background (in counts per minute) divided by the product of the quantity (in milliliters) of the solvent the square of the efficiency (as a decimal). For example, with a background of 16 counts per minute and a counting efficiency of 40%, the minimum count time for a 0.5 milliliter sample would be 10 minutes. The sample and background vials will be counted and the net count rate (in counts per minute) will be the difference between the two count rates. The diffusion rate will be the product of the net count rate and total volume (in milliliters) of soak water by the product of the efficiency, quantity of water in the vial (in milliliters) and soak time (in days). This diffusion test will be performed according to Inspection Level I of Table I.

**TABLE I –ATTRIBUTES SAMPLING INSPECTION –AR PD 115**

SIGHT, REFLEX WITH MOUNT, M68

| | Inspection Levels | |
|---|---|---|
| **Lot Size** | **I** | **II** |
| 2 to 8 | * | 5 |
| 9 to 15 | * | 5 |
| 16 to 25 | * | 5 |
| 26 to 50 | 32 | 5 |
| 51 to 90 | 32 | 3 |
| 91 to 150 | 32 | 13 |
| 151 to 280 | 32 | 20 |
| 281 to 500 | 32 | 20 |

Numbers under inspection levels indicate sample size; asterisks (*) indicate one hundred percent inspection. If sample size exceeds lot size, perform one hundred percent inspection. Accept on zero and reject on one or more for all inspection levels.

**TABLE II –FIRST ARTICLE TEST –AR PD 115**
SIGHT, REFLEX WITH MOUNT, M68

| CLASSIFICATION EXAMINATION OR TEST | CONFORMANCE REQUIREMENT CRITERIA | PARAGRAPH | RESPONSIBILITY |
|---|---|---|---|
| Magnification | 100% | 3.1.1 | Contractor (1) |
| Clear aperture | 100% | 3.1.2 | Contractor (1) |
| Dot angular spot size | 100% | 3.1.3.1 | Contractor (1) |
| Parallax | 100% | 3.1.3.2 | Contractor (1) |
| Illuminance | 100% | 3.1.3.3 | Contractor (1) |
| Azimuth and elevation adjustment | 100% | 3.1.3.4 | Contractor (1) |
| Adjustment repeatability | 100% | 3.1.3.5 | Contractor (1) |
| Power Source | 100% | 3.1.3.6 | Contractor (1) |
| Hue | 100% | 3.1.3.7 | Contractor (1) |
| Signature | 100% | 3.1.3.8 | Contractor (1) |
| Height Above Bore | 100% | 3.1.4 | Government |
| External Coatings | 100% | 3.2.1 | Contractor (1) (COC) |
| Sealing | 100% | 3.2.2.1 & 3.2.2.2 | Contractor (1) |
| Radioactive material content | 100% | 3.2.3 | Contractor (1) |
| Cleanliness and optical quality | 100% | 3.2.4 | Contractor (1) |
| Materials and construction | 100% | 3.2.5 | Contractor (1) (COC) |
| Lens/Dust Cover | 100% | 3.2.6 | Contractor (1) |
| Operability | 100% | 3.3.1 | Government |
| Attachment | 100% | 3.4.1 | Contractor (1) |
| Reattachment line of sight retention | 100% | 3.4.2 | Government |
| Shock | 100% | 3.5.1 | Contractor (1) |
| Vibration | 100% | 3.5.2 | Contractor (1) |
| Temperature | 100% | 3.5.3 | Contractor (1) |
| Humidity | 100% | 3.5.4 | Contractor (1) |
| NBC Decontamination | 100% | 3.5.5 | Government (Field Procedure) |
| Corrosion resistance | 100% | 3.5.6 | Government (MIL-STD-810) |
| Fungus | 100% | 3.5.7 | Contractor |
| Chemical resistance | 100% | 3.5.8 | Contractor |
| Sand and dust | 100% | 3.5.9 | Government (MIL-STD-810) |
| Thermal Shock | 100% | 3.5.10 | Contractor (1) |

**<u>TABLE II –FIRST ARTICLE TEST –AR PD 115</u>**

SIGHT, REFLEX WITH MOUNT, M68

| CLASSIFICATION EXAMINATION OR TEST | CONFORMANCE REQUIREMENT CRITERIA | PARAGRAPH | RESPONSIBILITY |
|---|---|---|---|
| Live Fire | 100% | 3.6.1 | Government |
| Drop Requirement | 100% | 3.6.2 | Government |
| Weight | 100% | 3.4.6 | Contractor |
| Radioactive material | 100% | 3.7 | Contractor (1) |
| Contamination Limits | 100% | 3.7.1 | Contractor (1) |
| Marking | 100% | 3.7.2 | Contractor (1) |
| Additional Environmental Tests | 100% | 3.7.3 | Contractor (1) |
| Laser Spectacles Compatibility | 100% | 3.8.1 | Government |
| Image Intensifier Compatibility | 100% | 3.8.2 | Government |

1. Procedure to be developed by the contractor and approved by the Government.

**TABLE III – QUALITY CONFORMANCE INSPECTION –AR PD 115**

SIGHT, REFLEX WITH MOUNT, M68

| CLASSIFICATION | EXAMINATION OR TEST | CONFORMANCE REQUIREMENT CRITERIA | PARAGRAPH | RESPONSIBILITY |
|---|---|---|---|---|
| **MAJOR** | | | | |
| 101 | Dot angular spot size | Level I | 3.1.3.1 | Contractor (1) |
| 102 | Parallax | Level I | 3.1.3.2 | Contractor (1) |
| 103 | Illumination | Level I | 3.1.3.3 | Contractor (1) |
| 104 | Azimuth & elevation adjustment | Level I | 3.1.3.4 | Contractor (1) |
| 105 | Adjustment repeatability | Level I | 3.1.3.5 | Contractor (1) |
| 106 | Hue | Level I | 3.1.3.7 | Contractor (1) |
| 107 | Cleanliness & optical quality | Level I | 3.2.4 | Contractor (1) - Visual |
| 108 | Reattachment line of sight retention | Level I | 3.4.2 | Contractor (1) |
| 109 | Radioactive material content | Level I | 3.7 | Government (COC) |
| 110 | Power source | Note 2 | 3.1.3.6.(b),(g) & (h) | Contractor (1) |
| 111 | Sealing | Note 2 | 3.2.2 | Contractor (1) |
| 112 | Shock | Note 2 | 3.5.1 | Contractor (1) |
| 113 | Vibration | Note 2 | 3.5.2 | Contractor (1) |
| 114 | Temperature | Note 2 | 3.5.3 | Contractor (1) |
| 115 | Humidity | Note 2 | 3.5.4 | Contractor (1) |
| 116 | Corrosion resistance | Note 2 | 3.5.6 | Contractor (1) |
| | | | | |
| **MINOR** | | | | |
| 201 | Materials and construction | Level II | 3.2.5 | Contractor (COC) – Visual |
| 202 | Weight | Level II | 3.4.6 | Contractor (1) |

1. Procedure to be developed by the contractor and approved by the Government.
2. Sample at a rate of 2 per 2,000, or 1 months production, whichever occurs first. Subsequent to these tests, the samples shall meet 3.1.3.1, 3.1.3.2, 3.1.3.3, 3.1.3.4, and 3.1.3.5.

END OF DOCUMENT AR PD 115

# EXHIBIT 4

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE: J

PAGE OF PAGES: 1 | 2

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO.(If applicable) |
|---|---|---|---|
| 0001 | 20-Aug-2007 | | |

6. ISSUED BY CODE W15QKN

JOINT MUNITIONS & LETHALITY LCMC ACQ CTR
AMSML-AQ-SW
SOLDIER WEAPONS CONTRACTING CTR
PHIPPS ROAD, BLDG 9
PICATINNY NJ 07806-5000

7. ADMINISTERED BY (If other than item 6) CODE

**See Item 6**

8. NAME AND ADDRESS OF CONTRACTOR (No., Street, County, State and Zip Code)

CODE FACILITY CODE

X 9A. AMENDMENT OF SOLICITATION NO. W15QKN-07-R-0428

X 9B. DATED (SEE ITEM 11) 02-Aug-2007

10A. MOD. OF CONTRACT/ORDER NO.

10B. DATED (SEE ITEM 13)

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

[X] The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offer [ ] is extended, [X] is not extended.

Offer must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended by one of the following methods: (a) By completing Items 8 and 15, and returning 1 copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS.
IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(B).

C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:

D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor [ ] is not, [ ] is required to sign this document and return ____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

See attached sheet

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print)

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)

TEL: EMAIL:

| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
|---|---|---|---|
| (Signature of person authorized to sign) | | BY (Signature of Contracting Officer) | 20-Aug-2007 |

EXCEPTION TO SF 30
APPROVED BY OIRM 11-84

30-105-04

STANDARD FORM 30 (Rev. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

SECTION SF 30 BLOCK 14 CONTINUATION PAGE

**SUMMARY OF CHANGES**

SECTION SF 30 - BLOCK 14 CONTINUATION PAGE

The following have been added by full text:

AMENDMENT A001

The purpose of this amendment is to provide answers to questions about the solicitation and to provide an updated Purchase Description.

1. The Purchase Description is updated as follows:
    a. To correct the paragraph reference numbers on Tables II and III and adjust the format for the two tables.
    b. Updated MIL-F-13926 with MIL-PRF-13830B (This is the replacement spec)
    c. In paragraph 3.4.2 clarified the requirement for reattachment line of sight retention.
    d. Deleted Paragraph 3.7 Interchangeability and renumbered the sections after that.
    e. Added weight requirement for First Article Test (FAT) in Table II.
    f. Under 2.1.2 Drawings deleted Zeroing Target Related 12012024.

2. On page 83 Section M Paragraph C.5.1. there was a typo it should read #6 instead of #7. There is no number 7.

3. Question: Can a non-US product compete?
   Answer: Yes a non-US product may compete. Note the requirements under DFARS 252.225-7000 and other clauses.

4. Question: What is the eye relief requirement?
   Answer: This is a unity power reflex sight, which has no eye relief requirement.

There is no change in the closing date. The closing date is 3:00 pm local time September 4, 2007.

(End of Summary of Changes)

# EXHIBIT 5

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| 1. CONTRACT ID CODE | PAGE OF PAGES |
|---|---|
| J | 1 \| 15 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO.(If applicable) |
|---|---|---|---|
| 0002 | 19-Oct-2007 | | |

| 6. ISSUED BY CODE W15QKN | 7. ADMINISTERED BY (If other than item 6) CODE |
|---|---|
| JOINT MUNITIONS & LETHALITY LCMC ACQ CTR<br>AMSML-AQ-SW<br>SOLDIER WEAPONS CONTRACTING CTR<br>PHIPPS ROAD, BLDG 9<br>PICATINNY NJ 07806-5000 | **See Item 6** |

| 8. NAME AND ADDRESS OF CONTRACTOR (No., Street, County, State and Zip Code) | | |
|---|---|---|
| | X | 9A. AMENDMENT OF SOLICITATION NO.<br>W15QKN-07-R-0428 |
| | X | 9B. DATED (SEE ITEM 11)<br>02-Aug-2007 |
| | | 10A. MOD. OF CONTRACT/ORDER NO. |
| CODE FACILITY CODE | | 10B. DATED (SEE ITEM 13) |

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

[X] The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offer [ ] is extended, [X] is not extended.

Offer must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended by one of the following methods:
(a) By completing Items 8 and 15, and returning 1 copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

**13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS.**
**IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

[ ] A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

[ ] B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(B).

[ ] C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:

[ ] D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor [ ] is not, [ ] is required to sign this document and return ____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

See attached sheet

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)<br>TEL: EMAIL: | |
|---|---|---|---|
| 15B. CONTRACTOR/OFFEROR<br>______________________<br>(Signature of person authorized to sign) | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA<br>BY ______________________<br>(Signature of Contracting Officer) | 16C. DATE SIGNED<br>19-Oct-2007 |

SECTION SF 30 BLOCK 14 CONTINUATION PAGE

**SUMMARY OF CHANGES**

SECTION SF 30 - BLOCK 14 CONTINUATION PAGE

The following have been added by full text:

AMENDMENT 0002

Amendment 0002 is to clarify two requirements under the Essential Criteria Subfactor. Section M Basis for Award is revised as shown below. Endurance-Live Fire will be clarified and Height Above Bore will correct a typographical error to read as shown below:

FROM:
C.1.1.10 Endurance-Live Fire: The bid sample shall be mounted on the M16A2 Rifle and shall withstand a 6,000 round endurance firing with no physical damage and maintain zero within 1 Gunner's mil upon completion of endurance test. This test shall also be performed on the M4 Carbine. (PD-115, Paragraph 3.6.1)

TO:
C.1.1.10 Endurance-Live Fire: The bid sample shall be mounted on the M16A2 Rifle and shall withstand a 6,000 round endurance firing with no physical damage and maintain zero within 1 Gunner's mil after 2,000 rounds. This test shall also be performed on the M4 Carbine. (PD-115, Paragraph 3.6.1)

FROM:
C.1.1.14 Height Above Bore. The mechanical axis of the optic housing shall be centered 8.2cm +/- 0.50cm above the bore axis when mounted to the M16A2 carry handle and 7.0cm +/- 0.25cm above the bore axis when mounted to the MIL-STD-1913 rail system on the upper receiver of the M4 carbine (PD-115, Paragraph 3.1.4).

TO:
C.1.1.14 Height Above Bore. The mechanical axis of the optic housing shall be centered 7.7cm +/- 0.50cm above the bore axis when mounted to the M16A2 carry handle and 7.0cm +/- 0.25cm above the bore axis when mounted to the MIL-STD-1913 rail system on the upper receiver of the M4 carbine (PD-115, Paragraph 3.1.4).

The revised Purchase Description is attached to show these changes also.

All other terms and conditions of the solicitation remain unchanged.

SECTION M - EVALUATION FACTORS FOR AWARD

The following have been modified:

BASIS FOR AWARD

**A. The Government intends to award one or two contracts as a result of this RFP. If multiple contract awards are made, each awardee will be provided a fair opportunity to be considered for each order. Order placement procedures will be included in the solicitation/contract. Submission requirements for each order will be kept to a minimum as recommended in the Federal Acquisition Regulation. See Section H for Delivery Order Evaluation Criteria.**

**The award will be made based on the best overall (i.e. best value) proposal that is determined to be the most beneficial to the Government, with appropriate consideration given to the following six evaluation factors.**

**The relative importance of these factors is as follows: Bid Sample is significantly more important than Quality System. Quality System is more important than Equipment/Production. Equipment/Production is more important than Price. Price is more important than Performance Risk. Performance Risk is more important than Small Disadvantaged Business (SDB) Participation. The non-price factors combined are significantly more important than the price factor. To receive consideration for award, a rating of Pass must be achieved under the Bid Sample Factor, Essential Criteria subfactor. Offerors are cautioned that the award may not necessarily be made to the lowest price proposal or the most highly rated proposal.**

## B. FACTORS AND SUB-FACTORS AND ELEMENTS TO BE EVALUATED

The evaluation factors are shown below in descending order of importance:

Bid Sample Factor

- Phase I - Essential Criteria Subfactor
    - PASS/FAIL
- Phase II - Rated Criteria Subfactor - The areas being tested within Phase II are of equal importance.
    - Rated Criteria:
        - Battery (ies) Performance
        - Battery Type
        - Shock
        - Drop Requirement
        - Signature
        - Applied Force
        - Human Systems Integration

Quality System Factor

Equipment/Production Factor - Sub factor 1 and sub factor 2 under the Equipment/Production Factor are of equal importance.

Sub Factor 1: Equipment and Facilities
Sub Factor 2: Production Capabilities

Price Factor

Performance Risk Factor

Small Disadvantaged Business Participation Factor

## C. EVALUATION APPROACH

### C.1.0 BID SAMPLE FACTOR

The following process will be used to evaluate each bid sample. All the tests will be conducted at Picatinny Arsenal, NJ, Aberdeen Proving Grounds, MD, and Ft. Benning, GA. **If at any point during the evaluation the government identifies a significant safety issue, the government shall discontinue testing and eliminate the candidate from any further consideration for award.** Bid samples will be evaluated using the same test procedures, test equipment, methodology, mounting setup and personnel for each subfactor. The bid samples will be evaluated in accordance with the following two (2) subfactors. Essential Criteria Subfactor (PASS/FAIL) will be evaluated first. Bid Sample must pass all these criteria.

a. Essential Criteria Subfactor – PASS/FAIL. A failure in any one or more of the essential criteria as stated shall be cause for elimination from further consideration for award and offerors submission will not be further evaluated. No extra credit will be awarded for exceeding the pass/fail requirements, in this category.

b. Rated Criteria Subfactor. All Bid Samples that pass essential criteria evaluation will be evaluated in accordance with the rated criteria as stated. A rating will be assigned based upon the extent to which the samples meet each requirement.

**C.1.1** **<u>Essential Criteria Subfactor</u>**: All bid samples will be evaluated for the characteristics listed below. This evaluation will be conducted on the bid sample hardware submitted to Picatinny Arsenal, NJ. This phase consists of visual observations as well as physical measurements of those characteristics listed in each criteria below. **If the offeror's bid samples fail to comply with any of the essential government requirements listed below, the offeror will be eliminated from any further consideration for award.**

C.1.1.1 Magnification: The bid sample will be rated based on its optical power. The device shall be a reflex (non-telescopic/unity power) sight which transmits light from the target to the viewer (PD-115, Paragraph 3.1.1).

C.1.1.2 Clear Aperture: The clear aperture of the bid sample shall be between 19mm and 45mm (PD-115, Paragraph 3.1.2).

C.1.1.3 Dot Angular Spot Size: Size shall be between one (1) and two (2) minute of arc, ± 0.5 minute of arc. The aiming reference shall consist of a single dot. (PD-115, Paragraph 3.1.3.1).

C.1.1.4 Parallax: The parallax of the bid sample shall be a maximum of 45 seconds of arc across a 3.5mm radius (centrally located) and a maximum of 3.0 minutes across the entire aperture. The parallax will be measured with sight's azimuth and elevation adjustments set at the midpoint of travel and for a target located at 300 meters (PD-115, Paragraph 3.1.3.2).

C.1.1.5 Azimuth and Elevation Adjustments: The line of sight of the bid sample shall be adjustable using tactile control with scales visible in daylight, in increments not exceeding 1 (one) minute of arc for a total movement of at least 60 minutes in azimuth and 60 minutes in elevation (PD-115, Paragraph 3.1.3.4).

C.1.1.6 Housing: The housing shall be built so as to completely enclose the illumination source from the outside environment (PD-115, Paragraph 3.2.5).

C.1.1.7 Mounting: The bid sample sight mount shall be attachable and detachable to the MIL-STD-1913 rail without the use of special tools*. Additional hardware must be provided for mounting the optic on the M16A2 rifle carry handle without using special tools. The mounting position of the sight will provide the capability for use of the iron sights of the M16A2 and the back up iron sight on the M4 for initial zeroing and as a backup without removal of the sight (PD-115, Paragraph 3.4.1).
* Special tools is defined as tools not contained in the armorer tool kit (NSN: 5180-00-357-7770). Adapting the optic mount(s) and/or the optic to either the MIL-STD-1913 rail or the M16A2 carrying handle may use special tools such as a knife, hex key or similar tools; at the armorer level only. Attachment and detachment of the optic to the weapon by the operator in the field shall require no special tools.

C.1.1.8 Weight: The total weight of the bid sample shall not exceed 1.50 lbs, including optic, battery(ies), sight mount for the M4 Carbine, antireflective device, and lens/dust covers attached. The total weight of the bid sample shall not exceed 1.50 lbs, including optic, battery(ies) sight mount for the M16A2 Rifle, antireflective device, and lens/dust covers attached (PD-115, Paragraph 3.4.6).

C.1.1.9 Power Source: The Bid Sample shall be powered using active or passive elements. If radioactive material is used as a power source, then the offeror shall provide a Nuclear Regulatory Commission (NRC) Material License to cover the specific bid sample model submitted for evaluation. Radioactive materials shall meet all the requirements specified in PD-115, Paragraph 3.8.1 "Contamination Limits". If a battery is used, it shall either be commercially available or in Government supply system (See PD-115, Paragraph 3.1.3.6). Battery (ies) shall be

replaceable without the use of tools. No damage shall occur to the bid sample if the battery is installed incorrectly. The bid sample shall **NOT** automatically turn off.

C.1.1.10 Endurance-Live Fire: The bid sample shall be mounted on the M16A2 Rifle and shall withstand a 6,000 round endurance firing with no physical damage and maintain zero within 1 Gunner's mil after 2,000 rounds. This test shall also be performed on the M4 Carbine. (PD-115, Paragraph 3.6.1)

C.1.1.11 Reattachment: The sight shall be mounted to a M16 rifle carry handle and, separately, a MIL-STD 1913 rail. These combinations shall be separately mounted to equipment capable of measuring angular deviations as small as 10 arc-seconds. A reference zero shall be recorded. The sight shall by cycled on and off the mount (M16 rifle carry handle itself, and MIL-STD-1913 rail itself, independently) ten (10) times. The line of sight shall be maintained within 0.33 mils. (PD-115, Paragraphs 3.4.1 and 3.4.2)

C.1.1.12 Illuminance: The dot luminance of the bid sample shall be manually adjustable. A calibrated light source (2873° color temperature) shall be placed at the target side of the optic. The light source shall be set at levels between 0.01 and 5,000 foot-lamberts. The observer shall determine if the reticle remains visible against the background throughout this range and can be adjusted so that blooming does not occur. The proposed design shall be tested using naked eye and third generation night vision devices viewing (PD-115, Paragraph 3.1.3.3)

C.1.1.13 Equipment Compatibility/Operability: The optic shall be compatible and operable with BLPS, ANPVS-14, PAQ-4, PEQ-2 IR sights, M4/M16A4 Back Up Iron Sight (BUIS) and the Multiple Integrated Laser Engagement System (MILES) equipment. The sight, when mounted in the M4 Carbine and M16A2/M16A4 rifle configurations shall be operable from the normal firing position and shall not interfere with the use of the items listed above.

C.1.1.14 Height Above Bore. The mechanical axis of the optic housing shall be centered 7.7cm +/- 0.50cm above the bore axis when mounted to the M16A2 carry handle and 7.0cm +/- 0.25cm above the bore axis when mounted to the MIL-STD-1913 rail system on the upper receiver of the M4 carbine (PD-115, Paragraph 3.1.4).

C.1.1.15 Environmental Testing: The proposed design shall withstand the following environmental testing:

a) Temperature Extremes: The proposed optic design with lens/dust covers and mounts shall be exposed and thermally stabilized at temperatures of -40 and +160 degrees F ± 2 degrees, (PD-115, Paragraph 3.5.3). The bid sample dot shall remain visible at the end of the test and no damage to optical surfaces, lens/dust covers or mounts shall occur.

b) Sand and Dust: The proposed optic design with mounts shall be subjected to Method 510.1 Dust (fine Sand) of MIL-STD-810, (PD-115 Paragraph 3.5.9). The bid sample shall show no degradation of performance to the optic and no dust shall enter the optic; dust may enter and affect the mounting system, however the mounting system shall be operable.

c) Thermal Shock: The proposed optic design with lens/dust covers shall be stabilized at 70 degrees F for a minimum of two hours then transfer within a period of 15 seconds to -40 degrees F at which it will be stabilized for at least two hours then transfer within a period of 15 seconds to an environment of 70 degrees F, (PD-115, Paragraph 3.5.10). The bid sample dot shall remain visible at the end of the test and no damage to optical surfaces or mounts shall occur.

d) Sealing: The proposed optic design shall withstand a water immersion. The optic shall remain internally watertight and moisture free. The test shall be conducted as indicated in PD-115, Paragraph 3.2.2. If battery (ies) are used, the battery compartment shall be waterproof when tested as part of Sealing requirement.

**C.1.2 <u>Rated Criteria Subfactor</u>:** The bid samples shall be tested and rated against the elements listed below.

C.1.2.1 Battery (ies) Performance: The Bid Sample's dot illuminance shall have sufficient capacity of operation duration at low temperatures while set on its maximum intensity level as specified in PD-115, Paragraph 3.1.3.6. The battery performance will be evaluated only at 168 hrs and 720 hrs of continuous operation. The dot illuminance must remain visible with a background scene luminance of 1,000 foot-lamberts.

| Rating | Definition |
|---|---|
| Excellent | The bid sample battery(ies) performance meets or exceeds continuous operation after |

| | |
|---|---|
| | 720 hrs at low temperatures. The dot illuminance remained visible with a background scene luminance of 1,000 foot-lamberts. |
| Satisfactory | The bid sample battery(ies) performance meets or exceeds 168 hrs but less then 720 hrs of continuous operation at low temperatures. The dot illuminance remained visible with a background scene luminance of 1,000 foot-lamberts. |
| Unsatisfactory | The bid sample battery(ies) does not meet the 168 hrs of continuous operation at low temperatures and/or the dot illuminance did not remain visible with a background scene luminance of 1,000 foot-lamberts. The proposal contains a major error(s), omission(s) or deficiency(ies) that indicates the bid sample cannot be expected to meet requirements without a major redesign to the bid sample. |

C.1.2.2 Battery Type: The bid sample shall not be powered by mercury or carbon zinc batteries. The bid sample shall be powered by either active or passive elements. If battery(ies) are used, the bid sample shall accept one of the types of batteries listed in PD-115, Paragraph 3.1.3.6.(a). The Bid Sample shall be evaluated for the number of batteries required to power the optic sight.

| Rating | Definition |
|---|---|
| Excellent | The bid sample can accept as a power source a single standard "AA" battery capable of accepting both lithium and alkaline compositions or is powered by a passive source. |
| Good | The bid sample is powered by a single battery which is listed in PD-115, Paragraph 3.1.3.6(a). |
| Satisfactory | The bid sample is powered by two batteries which are listed in PD-115, Paragraph 3.1.3.6(a). |
| Unsatisfactory | The bid sample is powered by batteries that contain mercury or carbon zinc and/or batteries which are not listed in PD-115, Paragraph 3.1.3.6 (a). Or bid sample is powered by more than two batteries. The proposal contains a major error(s), omission(s) or deficiency(ies) that indicates the bid sample cannot be expected to meet requirements without a major redesign to the bid sample. |

C.1.2.3 Shock: The proposed design shall be shocked under the conditions stated in PD-115, Paragraph 3.5.1. Observations shall be made to determine structural damage that impedes functionality of the optic other than cosmetic damage. The optic shall retain zero within 1 mil.

| Rating | Definition |
|---|---|
| Excellent | The bid sample showed no physical damage and no cosmetic damage. The bid sample retained zero within 0.5 mil. |
| Good | The bid sample showed no physical damage and no cosmetic damage. The bid sample retained zero within 0.75 mil. |
| Satisfactory | The bid sample showed no physical damage other than cosmetic damage and retained zero within 1 mil. |
| Unsatisfactory | The optic does not retain zero within 1 mil. The bid sample contains a deficiency(ies) that indicates the bid sample cannot be expected to meet requirements without a major redesign to the bid sample. |

C.1.2.4 Drop Requirement: The bid sample shall withstand a drop test as specified in PD-115, Paragraph 3.6.2. in both weapon configurations. Observations shall be made to determine structural damage that impedes functionality of the optic other than cosmetic damage. The optic shall retain zero within 1 mil.

| Rating | Definition |
|---|---|
| Excellent | The bid sample showed no physical damage and no major cosmetic damage. The bid sample retained zero within 0.5 mil. |
| Good | The bid sample showed no physical damage and no major cosmetic damage. The bid sample retained zero within 0.75 mil. |
| Satisfactory | The bid sample showed no physical damage other than major cosmetic damage and |

| Rating | Definition |
|---|---|
| | retained zero within 1 mil. |
| Unsatisfactory | The optic does not retain zero within 1 mil. The bid sample contains a deficiency(ies) that indicates the bid sample cannot be expected to meet requirements without a major redesign to the bid sample. |

C.1.2.5 Signature: The dot of the proposed optical sight shall not be visible at a 10 meter distance on the target side of the sight to the naked eye or to the AN/PVS-14, or equivalent, when the optic is in its middle brightness setting of the full range of settings (PD-115, Paragraph 3.1.3.8)

| Rating | Definition |
|---|---|
| Excellent | The reticle signature is not visible at 5m or less. |
| Good | The reticle signature is visible at distances greater than 5m but less then 7m. |
| Satisfactory | The reticle signature is visible at distances greater than 7m but less than 10m. |
| Unsatisfactory | The reticle signature is visible at distances greater than or equal to 10m. The bid sample contains a deficiency(ies) that indicates the bid sample cannot be expected to meet requirements without a major redesign to the bid sample. |

C.1.2.6 Applied Force: The sight shall be mounted to a M16 carry handle and, separately, a MIL-STD 1913 rail. These combinations shall be separately mounted to equipment capable of measuring angular deviations as small as 10 arc-seconds. A reference zero shall be recorded. The sight shall be subjected to incremental loads of five (5) lbs for a total of 25 lbs in three (3) perpendicular axes, one (1) being parallel to the optical axis. Zero retention shall be measured as deviation from the recorded zero. (PD-115, Paragraph 3.4.4)

| Rating | Definition |
|---|---|
| Excellent | The bid sample retained zero within .25 mils on both configurations. |
| Satisfactory | The bid sample retained zero within .5 mils. |
| Unsatisfactory | The bid sample failed to retained zero within .5 mils. The bid sample contains a deficiency(ies) that indicates the bid sample cannot be expected to meet requirements without a major redesign to the bid sample. |

C.1.2.7 Human Systems Integration: Human Systems Integration shall be evaluated by the bid sample hardware being examined for compatibility (man/machine interface) with the target audience soldier (5th-95th percentile soldier). Areas to be examined include: comfort during use, ease of attachment/removal from the host weapon, portability with the optic mounted on the weapon over field conditions, compatibility of the weapon with optic attached with existing soldier protective clothing and equipment (cold weather/MOPP IV/ body armor/BLPS), and ease of use to include all maintenance and operational tasks. Data will be collected from test participants, interviews with test personnel, interviews with Subject Matter Experts (SMEs), and through direct observation by experienced Human Factors Engineering practitioners. Each offeror will be assigned an adjectival rating based on results of the assessment. The following criteria will be used to determine how ratings are assigned to each offeror.

| Rating | Definition |
|---|---|
| Excellent | No deficiencies/weaknesses of any kind were identified during bid sample testing, or only minor weaknesses were identified, but do not require further discussion or correction. |
| Good | Some weaknesses were identified during bid sample testing; however, they do not present any safety of use issues, nor require changes to the hardware in order to mitigate the weaknesses. |

| Rating | Definition |
|---|---|
| Satisfactory | Few weaknesses were identified which do not present any safety of use issues, but which will require hardware modification in order to correct the shortcoming(s). The modifications required must not be considered to be a major re-design. A major design would be a changes requiring redesign of the bid sample housing or changes in optical configuration. |
| Unsatisfactory | A deficiency(ies) or significant weakness were identified during bid sample testing. The bid sample cannot be expected to meet requirements, or presents a safety of use issue and none of these conditions can be corrected without a major redesign to the bid sample. |

**C.1.3** **Overall Rated Criteria Rating:** Using the information gathered from the testing and evaluation in the subfactors above (C.1.2), the samples will be assigned an overall color rating to signify how well the bid samples met the Government's requirements.

| Evaluation | Standard |
|---|---|
| **Blue** | Offeror's Bid Sample Test demonstrates an excellent understanding and approach that meets all and exceeds several requirements. Essentially no doubt exists that the offeror will successfully provide a product that meets the Government's requirements. |
| **Green** | Offeror's Bid Sample Test demonstrate a good understanding and approach that meets all and exceeds some of the requirements. Little doubt exists that the offeror will successfully provide a product that meets the Government's requirements. |
| **Yellow** | Offeror's Bid Sample Test demonstrate a minimal understanding and approach that meets the requirements. Moderate doubt exists that the offeror will successfully provide a product that meets the Government's requirements. |
| **Red** | Offeror's Bid Sample Test do not demonstrate an acceptable understanding of the requirements. Offeror fails to demonstrate the ability to meet several requirements. Significant doubt exists that the offeror will provide a product that meets the Government's requirements. |

**C.2.0 QUALITY SYSTEM FACTOR**

The government will evaluate the offeror's proposed quality system plan against the following:

| Rating | Definition |
|---|---|
| Excellent | Quality System exceeds the RFP requirements with certification to a higher-level quality system (e.g. ISO 9001-2000 or ISO 9001-1994) and/or certification of Lean Six Sigma processes and tools. This represents an overall low degree of risk in meeting the Government's requirements. |
| Good | Quality System meets the RFP requirements with compliance to a higher-level quality system (e.g. ISO 9001-2000, ISO 9001-1994 or MIL-Q-9858). This represents an overall low to moderate degree of risk in meeting the Government's requirements. |
| Satisfactory | Quality System meets the RFP requirements with other than a higher-level quality system (e.g. ISO 9001-2000, ISO 9001-1994 or MIL-Q-9858). This represents an overall moderate to high degree of risk in meeting the Government's requirements. |
| Unsatisfactory | Quality System fails to meet the RFP requirements or no Quality System was provided. The proposal contains a deficiency(ies) that indicates the proposal cannot |

| Rating | Definition |
|---|---|
| | be expected to meet requirements or involves a very high risk and none of these conditions can be corrected without a major rewrite of the proposal. |

**C.3.0 EQUIPMENT/PRODUCTION FACTOR**

The government will evaluate the offerors' Equipment Facilities and Production Rates against the following. Within the Equipment/Production Factor each subfactor is of equal importance.

a. Equipment and Facilities Subfactor
b. Production Subfactor

C.3.1. The government will evaluate the availability and successful utilization of the equipment and facilities to meet the RFP schedule requirements.

| Rating | Definition |
|---|---|
| Excellent | The available manufacturing equipment and facilities the offeror proposes to use have been successfully utilized by the offeror to produce Military optical sights of equal or similar complexity as the CCO. All the equipment is readily available and no changes are necessary. This represents an overall low degree of risk in meeting the Government's requirements. |
| Good | The available manufacturing equipment and facilities the offeror proposes to use have been utilized by the offeror to produce equal or similar complexity items as the CCO. All the equipment is readily available and no changes are necessary. This represents an overall low to moderate degree of risk in meeting the Government's requirements. |
| Satisfactory | The available manufacturing equipment and facilities the offeror proposes to use have the capability to produce items similar to the CCO but have not been utilize to produce optical sight of equal or similar complexity. All the equipment is readily available and no changes are necessary. This represents an overall moderate to high degree of risk in meeting the Government's requirements. |
| Unsatisfactory | The available manufacturing equipment and facilities the offeror proposes to use does not have the capability to produce items similar to the CCO. Questionable availability of equipment. The proposal contains a deficiency(ies) that indicates the proposal cannot be expected to meet requirements or involves a very high risk and none of these conditions can be corrected without a major rewrite of the proposal. |

C.3.2. The government will evaluate the offerors production capabilities to meet the RFP schedule requirements.

| Rating | Definition |
|---|---|
| Excellent | Production rates currently meet 2,000 per month with no lead time required. Production rates can increase to 20,000 per month with a lead time of six (6) months, or less. This represents an overall low degree of risk in meeting the Government's requirements. |
| Good | Production rates currently meet 2,000 per month with no lead time required. Production rates can increase to 15,000 per month with a lead time of six (6) months, or less. This represents an overall low to moderate degree of risk in meeting the Government's requirements. |
| Satisfactory | Production rates meet 2,000 per month but require a lead time of six (6) months, or less. This represents an overall moderate to high degree of risk in meeting the Government's requirements. |

| Rating | Definition |
|---|---|
| Unsatisfactory | Production rates do not meet 2,000 per month with a lead time of six (6) months, or less. The proposal contains a deficiency(ies) that indicates the proposal cannot be expected to meet requirements or involves a very high risk and none of these conditions can be corrected without a major rewrite of the proposal. |

**C.4.0 PRICE FACTOR:**

(a) Prices proposed in Section B will be utilized in the performance of a price analysis in accordance with FAR 15.404-1(b). However, if deemed necessary by the Contracting Officer, a cost analysis may be performed per FAR 15.404-1(c).

A price evaluation will be conducted by totaling the evaluated prices for each ordering period and optional ordering periods. The evaluated price for each period will be calculated by computing an average evaluated unit price and multiplying the average evaluated unit price by the maximum quantity within that period's highest quantity range. The average evaluated unit price will be calculated as follows:

1) The evaluated quantity for each quantity range will be the maximum quantity within that range.

2) The evaluated quantity will be multiplied by the evaluated unit price to determine the evaluated amount for each quantity range.

3) The sum of the evaluated amounts will be divided by the sum of the evaluated quantities to derive the average evaluated unit price.

4) Adding the max quantity in highest range (270,000) for each year, the total (270,000 x 7 = 1,890,000) is more than the maximum quantity to be purchased under this contract (565,783), so when calculating each year Evaluated Price, the Average Evaluated Unit Price will be multiplied by 80,826 instead of 270,000. (565,783 / 7 = 80,826). All amounts will be computed with no decimal places.

5) After computing each years Evaluated Price, the seven years Evaluated Prices will be totaled to compute the Total Evaluated Price.

The total evaluated price will be adjusted for the value of any Government Furnished Property (See EVALUATION OF USE OF GOVERNMENT OWNED PRODUCTION AND RESEARCH PROPERTY).

The following tables are a sample of computing the total evaluated price:

FAT, PVT, Ordering Period Year 1

| Quantity Range | Evaluated Quantity | Evaluated Unit Price | Evaluated Amount |
|---|---|---|---|
| FAT - n/a | 10 | $25.00 | $250 |
| PVT - n/a | 100 | $22.00 | $2,200 |
| 100-15,000 | 15,000 | $20.00 | $300,000 |
| 15,001-100,000 | 100,000 | $17.50 | $1,750,000 |
| 100,001-185,000 | 185,000 | $15.00 | $2,775,000 |
| 185,001-270,000 | 270,000 | $12.50 | $3,375,000 |
| | | Year 1 Sum of Evaluated Amounts | $8,202,450 |

| | |
|---|---|
| Year 1 Sum of Evaluated Quantities | 570,110 |
| Year 1 Average Evaluated Unit Price | $14.39 |
| Year 1 Evaluated Price | $1,163,086 |

Ordering Period Year 2

| Quantity Range | Evaluated Quantity | Evaluated Unit Price | Evaluated Amount |
|---|---|---|---|
| 100-15,000 | 15,000 | $19.00 | $285,000 |
| 15,001-100,000 | 100,000 | $16.50 | $1,650,000 |
| 100,001-185,000 | 185,000 | $14.00 | $2,590,000 |
| 185,001-270,000 | 270,000 | $11.50 | $3,105,000 |

| | |
|---|---|
| Year 2 Sum of Evaluated Amounts | $7,630,000 |
| Year 2 Sum of Evaluated Quantities | 570,000 |
| Year 2 Average Evaluated Unit Price | $13.39 |
| Year 2 Evaluated Price | $1,082,260 |

Ordering Period Year 3

| Quantity Range | Evaluated Quantity | Evaluated Unit Price | Evaluated Amount |
|---|---|---|---|
| 100-15,000 | 15,000 | $18.00 | $270,000 |
| 15,001-100,000 | 100,000 | $15.50 | $1,550,000 |
| 100,001-185,000 | 185,000 | $13.00 | $2,405,000 |
| 185,001-270,000 | 270,000 | $10.50 | $2,835,000 |

| | |
|---|---|
| Year 3 Sum of Evaluated Amounts | $7,060,000 |
| Year 3 Sum of Evaluated Quantities | 570,000 |
| Year 3 Average Evaluated Unit Price | $12.39 |
| Year 3 Evaluated Price | $1,001,434 |

Ordering Period Year 4

| Quantity Range | Evaluated Quantity | Evaluated Unit Price | Evaluated Amount |
|---|---|---|---|
| 100-15,000 | 15,000 | $17.00 | $255,000 |
| 15,001-100,000 | 100,000 | $14.50 | $1,450,000 |
| 100,001-185,000 | 185,000 | $12.00 | $2,220,000 |
| 185,001-270,000 | 270,000 | $9.50 | $2,565,000 |

| | |
|---|---|
| Year 4 Sum of Evaluated Amounts | $6,490,000 |

Year 4 Sum of Evaluated Quantities 570,000

Year 4 Average Evaluated Unit Price $11.39

Year 4 Evaluated Price $920,608

Ordering Period Year 5

| Quantity Range | Evaluated Quantity | Evaluated Unit Price | Evaluated Amount |
|---|---|---|---|
| 100-15,000 | 15,000 | $16.00 | $240,000 |
| 15,001-100,000 | 100,000 | $13.50 | $1,350,000 |
| 100,001-185,000 | 185,000 | $11.00 | $2,035,000 |
| 185,001-270,000 | 270,000 | $8.50 | $2,295,000 |

Year 5 Sum of Evaluated Amounts $5,920,000

Year 5 Sum of Evaluated Quantities 570,000

Year 5 Average Evaluated Unit Price $10.39

Year 5 Evaluated Price $839,782

Ordering Period Year 6

| Quantity Range | Evaluated Quantity | Evaluated Unit Price | Evaluated Amount |
|---|---|---|---|
| 100-15,000 | 15,000 | $15.00 | $225,000 |
| 15,001-100,000 | 100,000 | $12.50 | $1,250,000 |
| 100,001-185,000 | 185,000 | $10.00 | $1,850,000 |
| 185,001-270,000 | 270,000 | $7.50 | $2,025,000 |

Year 6 Sum of Evaluated Amounts $5,350,000

Year 6 Sum of Evaluated Quantities 570,000

Year 6 Average Evaluated Unit Price $9.39

Year 6 Evaluated Price $758,956

Ordering Period Year 7

| Quantity Range | Evaluated Quantity | Evaluated Unit Price | Evaluated Amount |
|---|---|---|---|
| 100-15,000 | 15,000 | $14.00 | $210,000 |
| 15,001-100,000 | 100,000 | $11.50 | $1,150,000 |
| 100,001-185,000 | 185,000 | $9.00 | $1,665,000 |
| 185,001-270,000 | 270,000 | $6.50 | $1,755,000 |

Year 7 Sum of Evaluated Amounts $4,780,000

| | |
|---|---|
| Year 7 Sum of Evaluated Quantities | 570,000 |
| Year 7 Average Evaluated Unit Price | $8.39 |
| Year 7 Evaluated Price | $678,130 |
| Total Evaluated Price (All Years) | $6,444,256 |

The unit prices contained in the sample above were fabricated for demonstration purposes only and in no way reflect the unit prices the government expects to pay.

(b) Cost inconsistencies. A proposal is presumed to represent an Offeror's best effort to respond to the solicitation. Any inconsistency, whether real or apparent, between promised performance and price, should be explained in the proposal. Any significant inconsistencies, if unexplained, raise a fundamental issue of the offeror's understanding of the nature and scope of work required and his financial ability to perform the contract, may be grounds for rejection of the proposal.

All price evaluation will be conducted in accordance with 52.219-4.

If offeror is identified as HubZone or Small Business Concern in accordance with the definition under 52.219-4, price evaluation for all offerors will be conducted in accordance with 52.219-4.

**C.5.0 PERFORMANCE RISK FACTOR**

The Performance Risk evaluation will assess the relative risks associated with an offeror's likelihood of success in performing the solicitation's requirements as indicated by that offeror's record of past performance.

C.5.1. The Government will conduct a performance risk assessment based on the quality, relevancy and recency of the offeror's past performance, as it relates to the probability of successful accomplishment of the required effort.
When assessing performance risk, the Government will focus its inquiry on the past performance of the offeror as it relates to all solicitation requirements. These requirements include all aspects of schedule, performance and supportability, including the offeror's record of: 1) conforming to specifications and standards of good workmanship; 2) adherence to contract schedules, including the administrative aspects of performance; 3) ability to resolve technical and manufacturing problems quickly and effectively; 4) business-like concern for the interest of its customers; 5) establishing and maintaining adequate management of subcontractors; and 7) quality of product delivered as reflected by returns of product to the vendor for repair.

C.5.2. Offerors are cautioned that in conducting the performance risk assessment, the Government may use data provided in the offeror's proposal and data obtained from other sources. Since the Government may not necessarily interview all of the sources provided by the offerors, it is incumbent upon the offerors to explain the relevance of the data provided. Offerors are reminded that while the Government may elect to consider data obtained from other sources, the burden of proving low performance risk rests with the offerors.

| RATING | DEFINITION |
|---|---|
| **Low Risk** | Little doubt exists that the offeror can perform the required effort, based on their performance record. |
| **Moderate Risk** | Some doubt exists that the offeror can perform the required effort, based on their performance record. |
| **High Risk** | Significant doubt exists that the offeror can perform the required effort, based on their performance record. |
| **Unknown Risk** | Little or no relevant performance record identifiable; equates to an unknown risk rating having no positive or negative evaluation significance. |

**C.6.0 Small Disadvantaged Business (SDB) Participation Factor.**

The Government will evaluate the offeror's plan in accordance with the following specific criteria:

- The extent of Small Disadvantaged Business (SDB) Participation
- The acceptability of the contractor's plan or efforts to utilize SDBs
- The acceptability of the contractor's rationale as to the percentage of SDBs being utilized for the company

The offeror's efforts in utilizing SDBs for this contract will be rated in accordance with the following color-coded rating.

| COLOR | RATING | DEFINITION |
|---|---|---|
| **Blue** | **Excellent** | **Strong rationale to support appropriate percentage of SDBs to be utilized by the Contractor** |
| **Green** | **Good** | **Adequate rationale to support appropriate percentage of SDBs to be utilized by the Contractor** |
| **Yellow** | **Adequate** | **Weak rationale to support appropriate percentage of SDBs to be utilized by the Contractor** |
| **Red** | **Poor** | **No rational or plan provided that addresses percentage of SDBs to be utilized by the Contractor** |
| **Neutral** | **Neutral** | **Foreign companies do not have to submit a SDB plan if the offeror contract actions will be performed entirely outside of the US per FAR 19.1202-2(b)(4).** |

**C.7.0 EVALUATION OF USE OF GOVERNMENT OWNED PRODUCTION AND RESEARCH PROPERTY**

If Government production and research property is proposed for use in performance of any contract resulting from the solicitation, each offeror's total evaluated price will be adjusted to include a rental equivalent factor for each item of such property calculated in accordance with FAR Clause 52.245-9. This adjustment shall apply for the use of government property by the offeror as well as any subcontractor thereto, see Section L, Use of Government owned Production and Research Property.

(End of Summary of Changes)

# EXHIBIT 10

## (Excerpt)

JENNER&BLOCK

**BEFORE THE**
**GOVERNMENT ACCOUNTABILITY OFFICE**

**EXPEDITED NOTICE TO AGENCY REQUESTED TODAY**
**STAY REQUESTED**

# PROTEST OF L-3 COMMUNICATIONS EOTECH, INC. UNDER JOINT MUNITIONS & LETHALITY LIFE CYCLE MANAGEMENT COMMAND SOLICITATION NO. W15QKN-07-R-0428

W. Jay DeVecchio
Kevin C. Dwyer
Daniel E. Chudd
Damien C. Specht

Jenner & Block LLP
601 Thirteenth Street, NW
Suite 1200 South
Washington, DC 20005
(202) 639-6893
(202) 637-6365 (fax)

Counsel for Protester,
L-3 Communications EOTech, Inc.

~~CONTAINS CONFIDENTIAL, PROPRIETARY AND COMPETITION SENSITIVE INFORMATION~~
~~NOT TO BE DISCLOSED OUTSIDE OF THE GOVERNMENT~~
~~PROTECTIVE ORDER REQUESTED~~

# TABLE OF CONTENTS

Page

SUSPENSION OF CONTRACT AWARD AND PERFORMANCE .......... 2
PROTEST TIMELINESS .......... 2
INTERESTED PARTY STATUS .......... 2
PROTECTIVE ORDER, DOCUMENT REQUEST & HEARING .......... 2
NOTIFICATION OF CONTRACTING OFFICER .......... 3
SUMMARY OF PROTEST GROUND .......... 3
FACTUAL BACKGROUND .......... 3
A. Overview of the Solicitation .......... 3
B. The Evaluation Criteria .......... 4
C. Competitive Range Determination and Debriefing .......... 5
GROUND FOR PROTEST .......... 6
I. THE ARMY APPLIED UNSTATED, NONUNIFORM CRITERIA AND [redacted] AND THE UNREASONABLE EXCLUSION OF L-3 FROM THE COMPETITIVE RANGE. .......... 6
A. The Unstated, Unrealiable Criterion .......... 7
B. [redacted] .......... 7
CONCLUSION AND REQUEST FOR RELIEF .......... 9

**EXPEDITED NOTICE TO AGENCY**
**REQUESTED TODAY**
**STAY REQUESTED**

JENNER&BLOCK

Jenner & Block LLP
601 Thirteenth Street, NW
Suite 1200 South
Washington, DC 20005
Tel 202-639-6000
www.jenner.com

Chicago
New York
Washington, DC

W. Jay DeVecchio
Tel 202 639-6893
Fax 202 637-6365
jdevecchio@jenner.com

April 3, 2008

***VIA E-MAIL AND HAND DELIVERY***

General Counsel
Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548

Attn: Procurement Law Control Group

**Re: Protest of L-3 Communications EOTech, Inc. Under Joint Munitions & Lethality Life Cycle Management Command Solicitation No. W15QKN-07-R-0428**

Dear Sir:

L-3 Communications EOTech, Inc. ("L-3"),[1] through its undersigned counsel, protests its exclusion from the competitive range under the above-referenced solicitation (the "Solicitation" or "RFP"). The Solicitation seeks proposals to supply Sight, Reflex with Quick Release and Mount for Close Combat Optic ("CCO Sight"). The procurement is being conducted by the Joint Munitions & Lethality Life Cycle Management Command Acquisition Center ("the Army" or "the agency").

L-3 submitted a proposal in response to the Solicitation, including 20 samples of its CCO Sight. Through testing of these samples, [redacted] Subsequently, L-3 was excluded from the competitive range. This occurred because the Army failed [redacted] Instead, the Army [redacted] particularly in light of the fact that each offeror would be proposing different designs. This Protest challenges L-3's exclusion from the competitive range based on the Army's flawed testing.

---

[1] L-3 Communications EOTech, Inc. is located at 1201 East Ellsworth Road, Ann Arbor, Michigan 48105. A representative of L-3 is Paul Mangano, who can be reached at (734) 572-2200.

## SUSPENSION OF CONTRACT AWARD AND PERFORMANCE

This Protest is being filed on the third day (April 3, 2008) after the date on which a requested and required debriefing was offered to L-3 (March 31, 2008), and prior to award of the contract. L-3 requests that the GAO promptly notify the Army of the Protest in accordance with 31 U.S.C. § 3553 so the Army will be required to suspend award of a contract pending resolution of this Protest. *Id.* § 3553(c)(1). In the event a contract award is made prior to notification of the Army, any performance under the contract should be suspended because the Army will have been notified of L-3's protest within five days of L-3's requested and required debriefing. *Id.* § 3553(d)(4).

## PROTEST TIMELINESS

The Army notified L-3 of its exclusion from the competitive range on March 17, 2008. L-3 submitted a timely written request for a debriefing in accordance with FAR 15.505 on March 19, 2008.[2] The Army provided L-3 with its requested and required debriefing on March 31, 2008. L-3's protest is therefore timely under 4 C.F.R. § 21.2(a)(2) because it is being filed within ten days after L-3 received its requested and required debriefing.

## INTERESTED PARTY STATUS

L-3 is an "interested party," under 4 C.F.R. § 21.0(a), and is therefore authorized to file this Protest by 4 C.F.R. § 21.1(a). L-3 is an actual offeror under the Solicitation whose direct economic interest would be affected by the award of the contract to a party other than L-3.

## PROTECTIVE ORDER, DOCUMENT REQUEST & HEARING

L-3 requests that the GAO issue a protective order to safeguard the confidential and proprietary information of interested parties in this protest. As reflected in the legend appearing on each page, this Protest contains proprietary, confidential, and competition-sensitive information belonging to L-3, which should not be disclosed outside of the government.

Pursuant to 4 C.F.R. § 21.1(g), L-3 will serve a redacted copy of the protest on the GAO and the Army.

As provided in 4 C.F.R. § 21.l(d)(2), L-3 has attached to this Protest a request for production of specific documents as part of the Agency Report. Attachment A. L-3 also requests a hearing.

---

[2] On March 25, 2008, the Army offered the option of a pre-award or post-award debriefing. By letter of March 27, 2008, L-3 requested a pre-award debriefing.

## NOTIFICATION OF CONTRACTING OFFICER

The Contracting Officer identified in the RFP is Jennifer Aber of the U.S. Army Joint Munitions and Lethality Life Cycle Management Command. A copy of this protest, including its attachments, is being served electronically on the Contracting Officer on the same day it is filed with GAO, to the email address specified in the Solicitation, jennifer.aber@pica.army.mil, and is also being served by means of overnight carrier service to the physical address specified in the RFP, which is indicated on the final page of this Protest. Ms. Aber can be contacted by telephone at (973) 724-4113.[3]

## SUMMARY OF PROTEST GROUND

The Army's testing of L-3's bid samples for [redacted] was flawed because the Army (1) tested using an unstated criterion that cannot be applied uniformly to all samples and offerors and (2) [redacted] These errors resulted in unfair testing and incorrect test results for the [redacted] directly leading to the unreasonable, prejudicial exclusion of L-3 from the competitive range.

## FACTUAL BACKGROUND

### A. Overview of the Solicitation

This is a procurement to supply optical reflex sights, incorporating a red aiming reference, to be mounted for use on the U.S. Army M16 series Rifle and M4 Carbine. The Army intends to award one or two contracts as a result of the Solicitation, with a minimum ordering obligation quantity of 100,000 units for one contractor, or 50,000 units per award for two contractors. RFP § A.

The Solicitation required offerors to submit a proposal comprising six volumes of data, as well as to provide "twenty (20) identical and complete Bid Samples that meet the Essential Criteria and Rated Criteria in Section M and identified in [Purchase Description ("PD")] 115." RFP § L.

L-3 has supplied more than 85,000 similar sights to various branches of the Department of Defense including the Army, Marine Corps, Air Force, Navy and Special Operations

---

[3] Current correspondence with the Army indicates that Anna Yim is acting as a Contracting Officer for the CCO procurement. Therefore, we have also served Ms. Yim electronically on the same day as this protest is being filed at the GAO, and she will be sent a hardcopy by overnight delivery to the address indicated on the last page of this Protest. Ms. Yim may be reached at anna.yim@us.army.mil or by telephone at (973) 724-4108.

~~CONTAINS CONFIDENTIAL, PROPRIETARY AND COMPETITION SENSITIVE INFORMATION~~
~~NOT TO BE DISCLOSED OUTSIDE OF THE GOVERNMENT~~
~~PROTECTIVE ORDER REQUESTED~~

Command. Overall, L-3 has manufactured and delivered more than 400,000 units to military, federal law enforcement and commercial customers.

**B. The Evaluation Criteria**

Section M of the Solicitation establishes the evaluation criteria. "The award will be made based on the best overall (i.e. best value) proposal that is determined to be the most beneficial to the Government," on the basis of the following six evaluation factors, in decreasing order of importance: Bid Sample, Quality System, Equipment/Production, Price, Performance Risk, and Small Disadvantaged Business Participation. RFP § M.A. The Bid Sample Factor included two subfactors – an Essential Criteria Subfactor that was rated Pass/Fail and a Rated Criteria subfactor that tested Battery Performance, Battery Type, Shock, Drop Requirement, Signature, Applied Force, and Human Systems Integration.[4] RFP § M.B. "To receive consideration for award, a rating of Pass must be achieved under the Bid Sample Factor, Essential Criteria subfactor." RFP § M.A.

Bid samples were to be evaluated by testing at Picatinny Arsenal, NJ, Aberdeen Proving Grounds, MD, and Ft. Benning, GA. The bid samples were to be evaluated "using the same test procedures, test equipment, methodology, mounting setup and personnel for each subfactor." RFP § M.C.1.0. To pass the first Bid Sample Factor subfactor, an offeror's samples had to receive a Pass on each of 15 Essential Criteria, [redacted]

[redacted]

[4] The Equipment/Production Factor also included two subfactors: "Equipment and Facilities" and "Production Capabilities." RFP § M.B.

[5] [redacted]

[redacted]

### C. Competitive Range Determination and Debriefing

During the March 31 debriefing, L-3 was informed [redacted] The Army did not evaluate L-3 further "due to a failure in the essential criteria." *Id.* at Slide 16.

[redacted]

Upon hearing this, L-3 explained that [redacted] and noted additionally that the

---

[redacted]

[6] Common practice would be to [redacted]

[7] [redacted]

[redacted][8] This error on the part of the Army caused the failing test results. L-3, therefore, requested the Army retest its bid sample [redacted] The Army agreed to provide the additional test documentation.

Following the debriefing, the agency's contract specialist, Kelly Nash, emailed L-3 that the Army would not redo any part of the Solicitation testing.

## GROUND FOR PROTEST

**I. THE ARMY APPLIED UNSTATED, NONUNIFORM CRITERIA AND [redacted] RESULTING IN FLAWED TEST RESULTS AND THE UNREASONABLE EXCLUSION OF L-3 FROM THE COMPETITIVE RANGE.**

Although FAR 15.306(c) allows an agency to establish a competitive range of only the most highly rated proposals, the agency's determination must be reasonable and in accordance with the RFP evaluation criteria. *See Wilson Beret Comp.*, B-289685, April 9, 2002, 2002 CPD ¶ 206 at 3; *Symtech Corp.*, B-289332, Feb. 19, 2002, 2002 CPD ¶ 43.

Further, while the GAO has generally given deference to an agency's evaluation of bid samples, that deference can only be based on proper testing. No deference is given if the record establishes that the agency's judgment was without a basis in fact, or that samples were not fairly and conscientiously evaluated in accordance with the RFP. *Airways Industries, Inc., et al*, B-190093, 78-2 CPD ¶ 115, Aug. 14, 1978 at 12; *Cathey Enterprises, Inc.*, B-194334, June 13, 1979, 79-1 CPD ¶ 418 at 3. As a result, an incorrectly administered test cannot be used to sustain an award. *See, e.g., CXR Telecom*, B-249610, B-249610.5, 93-1 CPD ¶ 308, Apr. 9, 1993 at 12.

Here, the Army's evaluation of L-3's bid sample test results for the [redacted] cannot withstand any level of scrutiny for two reasons: ***First***, it applied a testing method – [redacted] – that was nowhere stated in the RFP and that in any event cannot be reliably applied [redacted]

---

8 [redacted]

**A. The Unstated, Unreliable Criterion**

All offerors must be evaluated (tested) equally and they must be done so in accordance with clear evaluation criteria. *See BAE Tech. Servs., Inc.*, B-296699, Oct. 5, 2005, 2006 CPD ¶ 91 at 5 ("[I]t is fundamental that the contracting agency must treat all offerors equally, which includes ... not disparately evaluating offerors with respect to the same requirements."); *Matter of Sci-Tec Guaging, Inc.*; *Sarasota Measurements & Controls, Inc.*, B-252406, June 25, 1993, 93-1 CPD ¶ 494 at 7 ("It is fundamental that offerors must be advised of the bases upon which their proposals will be evaluated."). Neither of those fundamentals was followed here. The Army admitted at the debriefing that it applied an unstated criterion [redacted] that is nowhere to be found in the Solicitation and that cannot be reasonably inferred. Even if it could be inferred, in no circumstance could an offeror reasonably also infer that [redacted] as the Army stated in the debriefing.

Furthermore, there is no conceivable way that, even if one could infer ***both*** [redacted] particularly since offerors would be proposing products of varying designs. [redacted] This necessarily means that offerors could not have been tested uniformly or consistently.[9]

**B.** [redacted]

In the supplemental instructions L-3 provided with its bid samples, the Army was instructed to: [redacted]

---

9 [redacted]

10 [redacted]

[redacted] The Army, however, ignored these facts and made the faulty and unstated assumption that it could [redacted] The results of this assumption, and the ensuing test results, were demonstrably flawed.

[redacted] Thus, the Army should have been aware of the testing error due to [redacted] Yet, it failed even to pose a question – *i.e.*, seek permissible clarification in accordance with FAR 15.306(b)(2) – from L-3.[11]

The GAO has consistently emphasized the need for flexibility in the application of pass fail tests leading to the exclusion of an offeror. *See CXR Telecom*, 93-1 CPD ¶ 308 at 11. According to the GAO, "benchmark testing should be an inherent part of the negotiation process, during which deficiencies should be pointed out and then corrected if possible …, and benchmarks should be rerun as necessary to correct a deficiency in order to maximize competition." *Id.*

The Army did not even make minimal efforts to diagnose the problem or ensure that there was no error on its part leading to the failing test results. One simple call or email to L-3 to clarify [redacted] Similarly, a routine inspection of [redacted]

---

[11] FAR 15.306 states in relevant part:

> (b) *Communications with offerors before establishment of the competitive range.* Communications are exchanges, between the Government and offerors, after receipt of proposals, leading to establishment of the competitive range. If a competitive range is to be established, these communications – …(2) May be conducted to enhance Government understanding of proposals; allow reasonable interpretation of the proposal; or ***facilitate the Government's evaluation process***….

FAR 15.306(b)(2) (first italics in original, second bold italics added).

[redacted] Had the Army taken any of these steps, it could have immediately retested L-3 bid sample to get the proper results, and thus made the effort to maximize competition.

Consequently, the Army's decision to eliminate L-3 on the basis of these faulty test results is unreasonable. The testing applied an unstated criterion that in all events was inherently and necessarily not uniform and unreliable. Furthermore, the application of that test to L-3's samples did not represent a fair or conscientious evaluation [redacted] the test results cannot support eliminating L-3 from the competitive range.

**CONCLUSION AND REQUEST FOR RELIEF**

For the reasons stated above, the Army's decision to exclude L-3 from the competitive range was irrational, prejudicial, and at odds with the law governing proposal evaluation. Accordingly, L-3 respectfully requests that GAO:

1. Sustain L-3's protest;

2. Recommend that the Army (a) continue the suspension of contract award; (b) conduct a proper evaluation of L-3's [redacted] and (c) and make a new competitive range determination on the basis of the retesting;

3. Recommend that the Army reimburse L-3 for the attorney's fees and other costs reasonably incurred by L-3 in pursuit of its protest, as provided by 4 C.F.R. § 21.8(d); and

4. Grant such other relief as GAO determines to be just and equitable.

~~CONTAINS CONFIDENTIAL, PROPRIETARY AND COMPETITION SENSITIVE INFORMATION~~
~~NOT TO BE DISCLOSED OUTSIDE OF THE GOVERNMENT~~
~~PROTECTIVE ORDER REQUESTED~~

Respectfully submitted,

W. Jay DeVecchio
Kevin C. Dwyer
Daniel E. Chudd
Damien C. Specht

Counsel for Protester.
L-3 Communications EOTech, Inc.

cc: Jennifer Aber
US Army JM&L LCMC
AMSML-AQ-SW, Bldg. 9
Picatinny, NJ 07806-5000
Phone: (973) 724-4113
jennifer.aber@pica.army.mil

Anna Yim
US Army JM&L LCMC
AMSML-AQ-SW, Bldg. 9
Picatinny Arsenal, NJ 07806-5000
Phone: (973) 724-4108
Fax: (973) 724-3340
anna.yim@us.army.mil